[No. A128121. First Dist., Div. Four. Mar. 11, 2011.]

STEPHEN WOLLMER, Plaintiff and Appellant, v.
CITY OF BERKELEY et al., Defendants and Respondents;
R.B. TECH CENTER LP et al., Real Parties in Interest and Respondents.

[black redaction bars]

## COUNSEL

Stephen Wollmer, in pro. per., for Plaintiff and Appellant.

Zach Cowan and Laura McKinney for Defendants and Respondents.

Cox, Castle & Nicholson, Andrew B. Sabey and Melanie Sengupta for Real Parties in Interest and Respondents.

## OPINION

**REARDON, J.**—Appellant Stephen Wollmer asks this court to reverse the denial of his petition for administrative mandamus challenging two approvals by respondents City of Berkeley and the Berkeley City Council (collectively, the City) for a mixed-use affordable housing or senior affordable housing project located at 1200 Ashby Avenue.[1] Specifically, he denounces the approvals as violative of the state's density bonus law as well as the California Environmental Quality Act (CEQA).[2] We conclude the trial court properly denied the petition and entered judgment in favor of the City; accordingly, we affirm the judgment.

## I. FACTUAL BACKGROUND

The site of the proposed projects at 1200 Ashby Avenue consists of 0.79 acres, located at the southeast corner of San Pablo Avenue and Ashby Avenue in Berkeley. Currently vacant, the northern portion of the site previously was a gas station, and the soil has been remediated. The area generally has been developed with one- and two-story commercial and mixed-use buildings. It abuts a lower density residential neighborhood to the east and a light industrial/commercial district to the west.

---

[1] As we explain, use permits have been approved for two projects on the site; prior to issuance of a building permit, the applicant will have to elect which alternative it will pursue.

[2] Public Resources Code section 21000 et seq.

A. *The Affordable Housing Project*

In November 2007, real parties in interest[3] submitted an application to the City for a new mixed-use building with condominiums (some affordable), retail space and parking (the Affordable Housing Project). With the submission of a revised application in April 2008, the application was deemed complete for processing. In January 2009, the Berkeley Zoning Adjustments Board approved the use permit application for a five-story building with 98 residential units (including 15 affordable units); 7,770 square feet of ground floor commercial space; 114 parking spaces; and a five-foot right-of-way to the City to accommodate a new left turn lane to alleviate traffic concerns. From the beginning the Developers sought approval of a density bonus as provided under state and local law. The use permit qualified the Developers for a minimum 32.5 percent density bonus under Government Code[4] section 65915 because, at the Developers' option, 20.3 percent of the base units would be affordable to low-income households if built as condominiums, and 10.8 percent of the affordable units would be affordable to very-low-income households if built as rentals.

Wollmer appealed the zoning adjustments board's decision and the City affirmed.

Prior to determining the project's status under CEQA, the City undertook a traffic analysis, particularly focused on traffic impacts to the San Pablo/Ashby intersection. The traffic study projected that on a typical weekday, the proposed project would generate approximately 34 trips during the morning peak hour and 41 trips during the afternoon peak hour; on Saturdays, the project was expected to generate 71 trips during the peak hour. The study concluded that "all study intersections operate at LOS [(level of service)][5] D or better during a.m., p.m. and Saturday peak hours, which meet City of Berkeley LOS standards." Further, under existing and approved project conditions, "all study intersections are expected to continue operating at acceptable levels of service with minor increases in delay during the weekday. During Saturday peak hour, the intersection of San Pablo Avenue and Ashby Avenue continues to operate at LOS F, with an insignificant increase in V/C [(volume-to-capacity ratio)] due to the added project traffic." Finally, the study also noted that the project sponsor offered to dedicate a right-of-way

---

[3] Real parties in interest are R.B. Tech Center LP; Memar Properties, Inc.; CityCentric Investments, LLC; and Ashby Arts Associates LP. We will refer to real parties in interest collectively as the Developers.

[4] Unless noted otherwise, all statutory references are to the Government Code.

[5] LOS (level of service) is a qualitative description of intersection operations reported on an A through F letter rating system to describe congestion and travel delay. LOS A signifies free flow conditions with little or no delay, while LOS F signifies jammed conditions with excessive delays and lengthy backups.

along the Ashby Avenue frontage which would enable the City to install a left turn lane and upgrade the signal, *resulting in improved traffic flow* at the intersection of San Pablo and Ashby Avenues despite additional trips generated from the project.

City planning staff considered the appropriate level of CEQA review for the project, including whether it would qualify for a "Class 32[6] Categorical Exemption for 'In-Fill Development Projects.' " The City determined that the Affordable Housing Project did qualify for this categorical exemption, and in May 2009 filed a notice of exemption.

B. *The Senior Affordable Housing Project*

Between 1990 and 2007, the population of 55 to 64 year olds in Berkeley increased 107.9 percent. To address changes in the housing market and to position the proposed development for certain funding opportunities, in May 2009, the Developers requested a modification to its use that would permit them to proceed with either the approved Affordable Housing Project, or a 98-unit mixed-use building for an affordable senior housing in-fill development (the Senior Affordable Housing Project). The proposed Senior Affordable Housing Project included 9,300 square feet of retail space, 25 parking spaces for the senior housing and 18 for retail. The residential units ranged in affordability from a 40 percent to 60 percent average median income.

The Developers also requested a revised trip generation estimate for the proposed Senior Affordable Housing Project. The transportation consultants concluded that the revised development would generate *fewer* trips than the already approved development, and of course like the Affordable Housing Project, it was not expected to have any significant traffic impacts.

The zoning adjustments board approved the modifications in June 2009. Wollmer appealed and the City again affirmed. Thereafter the city also determined that the proposed Senior Affordable Housing Project was exempt from CEQA on the same basis as the Affordable Housing Project. Thus, as of today, the Developers are authorized to proceed with either the Affordable Housing Project or the Senior Affordable Housing Project.

C. *Litigation*

Through a petition for administrative mandamus, Wollmer challenged the City approvals on several fronts, claiming violations of the City's zoning

---

[6] Referring to California Code of Regulations, title 14, section 15332, subdivision (a). Hereafter, we will refer to the CEQA regulations (*id.,* § 15000 et seq.) as the "Guidelines." (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1372 [44 Cal.Rptr.3d 128].)

ordinance, the state density bonus statutes and CEQA. Initially the trial court granted the petition in part, concluding that use permit condition 68, which allowed "Section 8"[7] rent subsidies for density-bonus-qualifying units, ran afoul of section 65915. The City and the Developers objected to the statement of decision on that point. Reconsidering its earlier ruling, the trial court denied the petition in its entirety. It found that the condition was consistent with the definitions of "rents" and "affordable rent" as set forth in governing law, and was consistent with the purpose of the density bonus law. This appeal followed.

## II. DISCUSSION

### A. *Density Bonus Law Issues*

Appellant asserts that the City's approvals violated state density bonus law in three ways: (1) condition 68 of the use permit allowed the Developers to receive Section 8 subsidies for density-bonus-qualifying units, thereby exceeding the maximum "affordable rent" established in Health and Safety Code section 50053; (2) the City's approval of amenities should not have been considered when deciding what standards should be waived to accommodate the project; and (3) the City improperly calculated the project's density bonus.

#### 1. *Standard of Review*

A public agency's grant of a land use permit or variance is an adjudicatory act, subject to judicial review by administrative mandamus. (*Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 938 [102 Cal.Rptr.3d 19] (*Wollmer I*); *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1211 [30 Cal.Rptr.2d 95].) In such proceedings, the inquiry extends to "whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); see *Wollmer I, supra*, 179 Cal.App.4th at p. 938.)

The trial court presumes that an agency's decision is supported by substantial evidence; it is the petitioner's burden to demonstrate the contrary. As well, the lower court examines the entire record and considers all relevant evidence, including evidence that detracts from the agency's decision. Although this task involves limited weighing, it does not amount to independent

---

[7] "Section 8" refers to section 8 of the United States Housing Act of 1937, as amended. (42 U.S.C. § 1437f.)

review because the trial court may only overturn the agency's decision if, based on the evidence before it, a reasonable person could not have reached the same conclusion. However, as to pure questions of law, the trial court exercises independent judgment. Finally, on appeal from the denial of a petition for administrative mandamus, we assume the same role as that of the trial court. (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921–922 [87 Cal.Rptr.3d 365]; see *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 839–840 [112 Cal.Rptr.3d 354].)

### 2. *Condition 68 of the Use Permit*

#### a. *Density Bonus Law and City's Inclusionary Ordinance*

The Legislature has declared that "[t]he availability of housing is of vital statewide importance . . . ," and has determined that state and local governments have a responsibility to "make adequate provision for the housing needs of all economic segments of the community." (§ 65580, subds. (a), (d).) Achieving the goal of providing housing affordable to low- and moderate-income households thus requires the cooperation of all levels of government. (*Id.*, subd. (c).) The Legislature has also declared that "there exists within the urban and rural areas of the state a serious shortage of decent, safe, and sanitary housing which persons and families of low or moderate income, including the elderly and handicapped, can afford." (Health & Saf. Code, § 50003, subd. (a).)

The state density bonus law is a powerful tool for enabling developers to include very-low-, low- and moderate-income housing units in their new developments. A " 'density bonus' " is "a density increase over the otherwise maximum allowable residential density as of the date of application by the applicant to the [municipality]." (§ 65915, subd. (f).) The purpose of this law is to encourage municipalities to offer incentives to housing developers that will "contribute significantly to the economic feasibility of lower income housing in proposed housing developments." (§ 65917.)

Section 65915 mandates that local governments provide a density bonus when a developer agrees to construct any of the following: (1) 10 percent of total units for lower income households; (2) 5 percent of total units for very-low-income households; (3) a senior citizen housing development or mobilehome park restricted to older persons, each as defined by separate statute; or (4) 10 percent of units in a common interest development for moderate-income families or persons. (*Id.*, subd. (b)(1)(A)–(D).) Although the details of the statute are complex, as explained in *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 824 [65 Cal.Rptr.3d 251]: "In other words, the Density Bonus Law 'reward[s] a developer who agrees to

build a certain percentage of low-income housing with the opportunity to build more residences than would otherwise be permitted by the applicable local regulations.' [Citation.]" To ensure compliance with section 65915, municipalities are required to adopt an ordinance establishing procedures for implementing the directives of the statute. (*Id.*, subds. (a), (d)(3).)

In its specifics, section 65915 establishes a progressive scale in which the density bonus percentage available to an applicant increases based on the nature of the applicant's offer of below market rate housing. Hence, proposed projects reserving a minimum of 10 percent of total units for moderate-income households receive a 5 percent density bonus, with every additional percentage point increase in applicable units above the minimum—up to 40 percent—receiving a 1 percent increase in the density bonus, up to a maximum 35 percent bonus. (§ 65915, subd. (f)(4).) Developers agreeing to construct a minimum of 10 percent of units for low-income households are eligible for a 20 percent density bonus, and the multiplier for each additional increase in units above the minimum amount—up to 20 percent—is 1.5 percent. (*Id.*, subd. (f)(1).) A similar scale applies to construction of very-low-income units, except that the minimum 20 percent density bonus kicks in when only 5 percent of units are reserved for this classification, and the multiplier for each additional percent increase in units above the minimum amount—up to 11 percent—is 2.5 percent. (*Id.*, subd. (f)(2).) Finally, for a senior housing development or age-restricted mobilehome park, the density bonus is 20 percent of the number of senior housing units. (*Id.*, subd. (f)(3).)

Section 65915 further provides that an applicant must agree to, and the municipality must ensure, the "continued affordability of all low- and very low income units that qualified the applicant" for the density bonus, for 30 years or longer if required by certain programs, including a rental subsidy program. (*Id.*, subd. (c)(1).) The statute goes on to state: "Rents for the lower income density bonus units *shall be set at an affordable rent* as defined in Section 50053 of the Health and Safety Code."[8] (§ 65915, subd. (c)(1), italics added.) In turn that provision establishes maximum ceilings for an "affordable rent." As pertinent to this appeal, Health and Safety Code section 50053 states: "For any rental housing development that receives assistance on or after January 1, 1991, and a condition of that assistance is compliance with this section, 'affordable rent,' including a reasonable utility allowance, shall not exceed: [¶] . . . [¶] (2) For very low income households, the product of 30 percent times 50 percent of the area median income adjusted for family size appropriate for the unit." (*Id.*, subd. (b)(2).) However, the statute also

---

[8] Wollmer constructs some of his arguments around the legislative history of certain amendments to section 65915, subdivision (c)(1). However, we resort to extrinsic sources of legislative intent only when a statute is ambiguous or fraught with latent ambiguity; this statute is not. (*Friends of Lagoon Valley v. City of Vacaville, supra*, 154 Cal.App.4th at p. 826.)

contemplates that the Department of Housing and Community Development (Department) may, by regulation, "adopt criteria defining and providing for determination of . . . rent for purposes of this section." (*Id.*, § 50053, subd. (c); see *id.*, § 50064.)

The Affordable Housing Project approved by the City includes eight units reserved for very-low-income households (10.8 percent of the base project of 74 units), entitling the Developers to a minimum density bonus of 32.5 percent. The Developers requested a 32.4 percent density bonus, which would allow 24 market rate units in addition to the 74-unit base project. For the modified Senior Affordable Housing Project, the Developers requested, and received, a 30.7 percent density bonus.

Condition 68 of the use permit approved by the City for either project details the affordability and income qualification requirements under both section 65915 and the City's inclusionary ordinance, Berkeley Municipal Code chapter 23C.12. Under the inclusionary ordinance, 20 percent of dwelling units in a subject project must qualify as inclusionary units.[9] (Berkeley Mun. Code, § 23C.12.030.A.) Further, where there is more than one such unit, at least half shall be rented at a price affordable to low-income or lower income households, provided the City can make available rental subsidies through Section 8 or an equivalent program. (*Id.*, § 23C.12.060.C.) In the case of an uneven number of inclusionary units, the majority must "be priced to be affordable to a Household at 50% of median income[10] if subsidies are available. If no rental subsidies are available, all Inclusionary Unit prices shall be affordable to Households at 81% income of the Oakland PMSA median." (Berkeley Mun. Code, § 23C.12.060.C.) In keeping with the inclusionary ordinance, condition 68 of the use permit allows Section 8 rents as the maximum housing payments for the eight very-low-income rental units qualifying for the section 65915 density bonus. We note that the Berkeley Housing Authority awarded the proposed project 87 project-based Section 8 certificates. This award allows the Developers to enter into an agreement with the Berkeley Housing Authority to construct the units, and, upon completion, for the parties to enter into a housing assistance payment contract for rental subsidies to those units. The proposed density bonus units come within the 87 project-based certificates.

---

[9] In general inclusionary units must be sold to the City "or to Low Income, Lower Income or Very Low Income Households or shall be rented to Households of similar incomes." (Berkeley Mun. Code, § 23C.12.040.A.)

[10] Median income levels for households are determined by reference to the Oakland Primary Metropolitan Statistical Area (PMSA) statistical figures available from the most recent United States census. (Berkeley Mun. Code, § 23C.12.030.C.)

b. *Analysis*

██ The crux of appellant's complaint is this: Condition 68 of the use permit violates the state density bonus law because it allows the Developers to receive substantially higher fair market rents available under the federal Section 8 housing program, rather than the maximum rents established under state law. Specifically, the concept of "affordable rent" means the rent that housing providers that receive density bonuses must *accept* as an affordable rent, not the rent at which a qualifying unit is *made available* to a prospective tenant. In short, appellant asserts that very-low-income units qualifying for state density bonus benefits cannot be rented for more than what Health and Safety Code section 50053, subdivision (b)(2) allows, namely 30 percent of 50 percent of area median income. Under this reasoning, the density bonus law *caps* the total rent a housing provider can receive *from any source* to the above amount, whether that rent comes from direct tenant payment or a combination of tenant contributions and a Section 8 subsidy. This is not the law.

Health and Safety Code section 50098 defines " '[r]ents' " as "the charges *paid by* the persons and families of low or moderate income for occupancy in a housing development assisted under this division whether the units are rented or operated as a cooperative." (Italics added.) As mentioned above, Health and Safety Code section 50053 also empowers the Department to promulgate regulations "defining and providing for determination of . . . rent for purposes of this section." (*Id.*, subd. (c).) Pursuant to this and other authority, the Department has defined the term " '[a]ffordable rent,' " as follows: " 'Affordable rent' also means rent charged as a tenant contribution under the provisions of Section 8 of the United States Housing Act of 1937, as amended, when the unit or household is receiving assistance pursuant to the Section 8 program."[11] (Cal. Code Regs., tit. 25, § 6922, subd. (d).)

██ It is apparent from all these provisions that, contrary to appellant's assertions, "affordable rent" within the meaning of our density bonus law is concerned with the rent that a tenant pays, not with the compensation received by the housing provider. A density bonus is granted to an applicant for a housing development in exchange for the applicant's agreement to

---

[11] Wollmer complains that the City ignores another regulatory provision that also cites Health and Safety Code section 50053 as authority, namely California Code of Regulations, title 25, section 6918, which states: " 'Rent' shall mean the total of monthly payments for a rental or cooperative unit for" the various components of rent, including use and occupancy, fees and service charges and a reasonable allowance for utilities not included in other fees or charges. This provision does not change anything. While Health and Safety Code section 50053 and California Code of Regulations, title 25, section 6922 spell out the contours of what constitutes an "affordable rent" to the low-income tenant, the purpose of this provision is to detail the constituent components that are included within the term "rent."

construct a percentage of affordable housing units. (§ 65915, subd. (b)(1).) The developer's responsibility thus is to build the agreed-upon affordable units and ensure the continued affordability of the units that qualified it for the density bonus, and that is all. (*Id.*, subd. (c)(1).) There is no further requirement that the developer accept only up to the rent cap set out in Health and Safety Code section 50053, subdivision (b). The definition of "rent" as it applies in this context refers to the "charges paid" by the low-income tenant, not to the compensation received by the developer. (*Id.*, § 50098.) Where there is assistance under the Section 8 program, "affordable rent" refers to the tenant's contribution, not to any subsidy in the hands of the developer. (Cal. Code Regs., tit. 25, § 6922, subd. (d).) ■ And it goes without saying that the concept of affordability pertains to the tenant, not the developer. The rents for density bonus units must "be set at an affordable rent" *so that the prospective lower income tenants can obtain and pay for housing.* (§ 65915, subd. (c)(1).) It would be nonsensical to equate the notion of setting of "an affordable rent" with that of setting and capping the developer's compensation.

Why does any of this matter to Wollmer? He posits that "at its core" the density bonus law is "a scheme of steeply progressive levels of benefits intended to offset some or all of the 'cost' of supplying deeper affordability." According to Wollmer, the statutory scheme is "undermined" if an applicant is allowed to capture the difference between Section 8 rents and the maximum rent for very-low-income-qualifying units under Health and Safety Code section 50053. Further, condition 68 of the use permit "fail[s] to impose the corresponding 'cost' of supplying very low income units to the Project."

We start with the purpose of the density bonus law, namely that the density bonus and other incentives offered by a municipality will "contribute significantly to the economic feasibility of lower income housing in proposed housing developments." (§ 65917.) The progressive level of benefits for deeper affordability is the mechanism by which municipalities entice developers to build low-income housing. The Section 8 housing program in turn is designed to deliver safe, sanitary and decent housing to low-income families. (*Bakos v. Flint Housing Com.* (6th Cir. 1984) 746 F.2d 1179, 1180.) That the City, through its inclusionary ordinance, requires the use of Section 8 rents if available for certain inclusionary units, enhances, rather than detracts from, the goal of "contribut[ing] significantly to the economic feasibility of lower income housing . . . ." (§ 65917.)

■ The inclusionary ordinance encourages use of the Section 8 program as a way of accomplishing deeper affordability (i.e., to households at 50 percent of median income) in development of inclusionary units in new housing projects. By allowing a developer the additional incentive of a Section

8 subsidy above the low-income tenant's contributions thus "contribute[s] significantly to the economic feasibility of lower income housing in proposed housing developments." (§ 65917.) On the other hand, imposing "costs" on a developer attempting to build affordable units is hostile to the letter and spirit of the density bonus law. (See *Friends of Lagoon Valley v. City of Vacaville, supra,* 154 Cal.App.4th at p. 826.) To conclude, section 65917 does not display any legislative intent to make developers choose between regulatory incentives and rental subsidies.

We note finally that federal law requires that 40 percent of all project-based Section 8 subsidies be provided to families with incomes at or below 30 percent of the area median income,[12] which equates to extremely low-income households under Health and Safety Code section 50053, subdivision (b)(1). Thus, the intersecting of the Section 8 program with the density bonus law results in development of more units provided to the most vulnerable population.

### 3. *Calculation of the Project's Density Bonus*

Wollmer also attacks the City's method of calculating a project's density bonus. He maintains that in deriving the number of density bonus units permitted under section 65915, the City wrongly applied the allowable density under its zoning ordinance rather than that set forth in the land use element of the general plan. The end result, he claims, is an inflated and illegal density bonus. According to Wollmer, the density allowed under the zoning ordinance is three times that allowed under the land use element. There is nothing wrong with the City's approach to calculating a project's density bonus.

 Some background is in order. The density increase allowed under the density bonus law is an increase "over the otherwise maximum allowable residential density . . . ." (§ 65915, subd. (f).) " 'Maximum allowable residential density' " in turn means "the density allowed under the zoning ordinance and land use element of the general plan, or if a range of density is permitted, means the maximum allowable density for the specific zoning range and land use element of the general plan applicable to the project. Where the density allowed under the zoning ordinance *is inconsistent with* the density allowed under the land use element of the general plan, the general plan density shall prevail." (*Id.,* subd. (*o*)(2), italics added.) This statute recognizes that there may be inconsistencies between the density permitted under a zoning ordinance as opposed to what is permitted under the land use element of a general plan, in which case the latter prevails.

---

[12] Title 42 United States Code section 1437n(c)(3).

The proposed projects are located within the C-W, West Berkeley Commercial District (C-W District), as indicated on the official zoning map. (Berkeley Mun. Code, § 23A.16.020.A.) The City's zoning ordinance does not specify a maximum density for the C-W District. (*Id.*, ch. 23E.64.) However, the land use element of the general plan specifies a maximum density of 44 to 88 persons (20 to 40 dwelling units) per acre for the area within the land use classification that includes the C-W District. (City of Berkeley General Plan, Land Use Element, pp. 16–18.) The land use element additionally explains that each land use classification "also includes a range of appropriate building intensities and in some cases, population densities. *The densities allowed by existing zoning are consistent with the policies of the General Plan. . . .* [¶] General Plan land use classifications are for general planning purposes. . . . They describe a range of land uses and intensities that reflect different General Plan policies related to the type, location, and intensity of development. Because the General Plan land use classifications describe a range of land uses and development intensities in a relatively large area, *they are not intended to be used as standards to determine the maximum allowable density on a specific parcel.* Allowable densities and uses in each zoning district are established in the more detailed and specific Zoning Ordinance." (*Id.* at p. 16, italics added.)

As explained by the City's director of planning and development, in keeping with this language in the land use element of the general plan, the City does not apply the general plan density standards to specific parcels. Instead, it applies the standards to larger areas of a land use classification surrounding a proposed project. Thus, a project is deemed consistent with the density standard if the number of units that would exist in the larger area upon completion of a project, as well as any other approved projects, is consistent with the general plan density standard for that area. Using this approach, the City can determine if overall growth in a particular area is consistent with general plan goals and objectives for that area, taking into account that new development will occur only on certain parcels and not uniformly throughout the area.

As staff noted, the project, along with other approved projects, would increase the density of the relevant district on San Pablo Avenue between Dwight Way and the Oakland border to approximately 19 units per acre, which is well below the general plan standard of 40 units per acre. Thus, the project, and its density bonus, are in compliance with the general plan density standard and are consistent with section 65915, subdivision (*o*)(2).

### 4. *Accommodating Project Amenities*

Wollmer further attacks the trial court's determination that the City did not violate the density bonus law by accommodating project amenities in the grant of a density bonus. This ruling was sound.

Again, some background is in order. Section 65915, subdivision (e)(1), as recently amended, provides in part: "In no case may a city . . . apply any development standard that will have the effect of physically precluding the construction of a development meeting the criteria of subdivision (b) at the densities or with the concessions or incentives permitted by this section. An applicant may submit to a city . . . a proposal for the waiver or reduction of development standards that will have the effect of physically precluding the construction of a development meeting the criteria of subdivision (b) at the densities or with the concessions or incentives permitted under this section, and may request a meeting with the city . . . ." (Stats. 2008, ch. 454, § 1, eff. Jan. 1, 2009.) The 2008 amendments to section 65915 added the word "physically" to the first sentence; added the phrase beginning with "that will have the effect of physically precluding" to the second sentence; and deleted subdivision (f), which read: "The applicant shall show that the waiver or modification is necessary to make the housing units economically feasible." (Stats. 2008, ch. 454, § 1; see Deering's Ann. Gov. Code (2011 supp.) foll. § 65915, p. 490.)

Here, the City waived the standards for height, number of stories and setbacks, granting variances to allow an additional story and a higher building height, and to forego setbacks on two corners. What bothers Wollmer is the fact that the waiver of standards for height and setbacks was granted to accommodate certain project "amenities," namely an interior courtyard, a community plaza and 15-foot ceilings in the commercial space and nine-foot ceilings in the residential units. He contends that the City cannot waive development standards in order to approve a density bonus project unless it specifically finds that the waived standards physically preclude construction of the density-bonus-qualifying project, and waivers to accommodate project amenities do not meet this test.

First, it is clear that one of the effects of the 2008 amendments is to delete the requirement that an applicant for a waiver of development standards must show that the waiver was necessary to render the project economically feasible. Second, nothing in the statute requires the applicant to strip the project of amenities, such as an interior courtyard, that would require a waiver of development standards. Standards may be waived that physically preclude construction of a housing development meeting the requirements for a density bonus, period. (§ 65915, subd. (e)(1).) The statute does not say that

what must be precluded is a project with no amenities, or that amenities may not be the reason a waiver is needed. Wollmer's argument goes nowhere. Had the City failed to grant the waiver and variances, such action would have had "the effect of physically precluding the construction of a development" meeting the criteria of the density bonus law. (*Ibid.*; see *Wollmer I, supra,* 179 Cal.App.4th at p. 947.) If the project were not built, it goes without saying that housing units for lower income households would not be built and the purpose of the density bonus law to encourage such development would not be achieved. The trial court properly interpreted the statute, and the City proceeded in the manner required by law in granting the waivers.

### B. *CEQA Issues*

#### 1. *Application of the Categorical Exemption for In-fill Projects*

· The City found that the proposed projects were exempt from CEQA pursuant to Guidelines section 15332, and that the projects did not trigger any exceptions to that exemption under Guidelines section 15300.2. The trial court ruled that the City properly concluded the projects were exempt from CEQA review. Wollmer contests this ruling, arguing that the project did not qualify for this CEQA exemption.

 CEQA authorizes the resources agency to adopt guidelines that list classes of exempt projects, namely projects "which have been determined not to have a significant effect on the environment and which shall be exempt from this division." (Pub. Resources Code, § 21084, subd. (a).) These classes of projects are called "categorical exemptions" and are detailed in Guidelines section 15300 et seq. Guidelines section 15300.2 in turn specifies *exceptions and qualifications* to the categorical exemptions.

Guidelines section 15332, at issue here, sets forth a categorical exemption for in-fill development projects meeting certain conditions.[13] At issue on appeal is the subdivision (a) condition. This condition requires that projects qualifying for a class 32 exemption must comply with all *applicable* general plan designations and policies and all *applicable* zoning designations and regulations, in addition to the other protective criteria set forth in the

---

[13] Guidelines section 15332 reads in its entirety: "Class 32 consists of projects characterized as in-fill development meeting the conditions described in this section. [¶] (a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations. [¶] (b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses. [¶] (c) The project site has no value, as habitat for endangered, rare or threatened species. [¶] (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality. [¶] (e) The site can be adequately served by all required utilities and public services."

regulation. As pertinent here, the density bonus law provides that "[t]he granting of a density bonus shall not be interpreted, in and of itself, to require a general plan amendment . . . , zoning change, or other discretionary approval." (§ 65915, subd. (f)(5).) And, as explained in part II.A.4., *ante*, subdivision (e)(1) *prohibits* a local municipality from applying "any development standard that will have the effect of physically precluding the construction" of a density-bonus-qualifying development.

Here, to accommodate the project's density bonus, the City waived or reduced zoning standards for height, floor area ratio and setbacks. Absent these waivers, variances would have been required. It is Wollmer's position that the City's waiver of zoning standards as mandated by the density bonus law *precludes* the project from qualifying for the exemption. While the substantial evidence test governs our review of a municipality's factual determination that a project comes within a categorical exemption, Wollmer's arguments, and the City's reasoning, are interpretive exercises delving into the meaning and applicability of Guidelines section 15332, the density bonus law, and the City's own zoning ordinance.

The City reasoned that the development standards which it waived pursuant to section 65915, subdivision (e) were not "applicable" to the project within the meaning of Guidelines section 15332, subdivision (a) because the above statute renders these standards inapplicable in order to allow the density bonus. Further, the inclusionary ordinance, *which is part of the City's zoning ordinance*, generally *requires* the City to grant density bonuses upon a proper application (Berkeley Mun. Code, § 23C.12.050.A), and states that the "use of a Density Bonus is preferred over other types of concessions or incentives. Incentives may include, but are not limited to, fee deferments and waivers, granting of Variances, relaxation of otherwise applicable Permit conditions and provision of government benefits" (*id.*, § 23C.12.050.C).

 Wollmer asserts that by applying the exemption in a way that harmonizes with relevant law, the City in effect amended the exemption, improperly expanded its definition, and exceeded its jurisdiction. There is no support for this misguided assertion.[14] The City properly applied the plain meaning of Guidelines section 15332, subdivision (a) to its own codes in a manner that was in harmony with the state's density bonus law, and so

---

[14] Similarly misguided is Wollmer's contention that the City did not consider the "whole" of the project or action. In the language of CEQA, the term "project" means "the whole of an action" that has the potential to impact the environment. (Guidelines, § 15378, subd. (a).) Accordingly, CEQA expresses the policy that the lead agency "must consider the whole of an action, not simply its constituent parts, when determining whether it will have a significant environmental effect." (*Id.*, § 15003, subd. (h).) However, there is no allegation that the City has engaged in chopping or "piecemealing" the project into several little projects in order to minimize the environmental impact of the larger project. (See *Citizens Assn. for Sensible*

applied, properly found that the project was exempt from CEQA. On its face the exemption only requires consistency with applicable general plan designations and policies and applicable zoning designations and regulations. (Guidelines, § 15332, subd. (a).) The density bonus statute in turn requires a waiver of development standards that physically preclude construction of a density-bonus-qualifying project. (§ 65915, subd. (e)(1).) And the City's own zoning ordinance generally requires the grant of a density bonus upon a complete application. (Berkeley Mun. Code, § 23C.12.050.A.) Taking these laws together as they operate in the context of a density bonus project, it is clear that the waived zoning standards are not "applicable" and that the requirements of Guidelines section 15332, subdivision (a) were met.

■ With this conclusion we are mindful that we must construe the language of statutes and regulation in context, and must harmonize our laws " 'both internally and with each other, to the extent possible.' [Citations.]" (*Scottsdale Ins. Co. v. State Farm Mutual Automobile Ins. Co.* (2005) 130 Cal.App.4th 890, 898 [30 Cal.Rptr.3d 606].) For example, in *Harroman Co. v. Town of Tiburon* (1991) 235 Cal.App.3d 388 [1 Cal.Rptr.2d 72], the court similarly grappled with determining what was the "applicable general plan" within the meaning of former section 65589.5, against which a property owner's application for approval of a master plan for development must be evaluated: Did it refer to the adopted general plan that existed at the time of the application, or instead the proposed or draft general plan under consideration? The reviewing court went with the latter construction, noting that the plaintiff's proposed interpretation would nullify any remedial changes to the existing general plan made during the review process, and would be inconsistent with a related statute that required the town to ensure that any application for development be consistent with the general plan being studied or considered. (*Harroman Co. v. Town of Tiburon, supra,* 235 Cal.App.3d at pp. 395–396.) The court thus construed the term to give effect to both statutes at issue. So, too, reading the term "applicable" as used in Guidelines section 15332, subdivision (a) in a manner consistent with the state density bonus law gives effect to both laws and does not violate the policy of either.

■ Indeed, this construction honors the policies of both laws. In this regard we note that the density bonus law does not require cities to waive development standards if the waiver or reduction would have a significant adverse impact on the health, safety or physical environment that cannot be mitigated or avoided. (§§ 65915, subd. (e)(1), 65589.5.) Moreover, mere "[i]nconsistency with the zoning ordinance or general plan land use designation shall not constitute a specific, adverse impact upon the public health or

*Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 165 [217 Cal.Rptr. 893].) Rather, the project is a single building, and the whole of the action has been considered and analyzed.

safety." (§ 65589.5, subd. (d)(2).) ▉▉▉ At the same time, the policy underlying CEQA includes the intent to ensure "the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian . . . ." (Pub. Resources Code, § 21001, subd. (d).)

### 2. *No Unusual Circumstances Preventing Categorical Exemption*

Guidelines section 15300.2, subdivision (c) identifies certain exceptions to the use of categorical exemptions, including the following: "(c) Significant Effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." Unusual circumstances exist "where the circumstances of a particular project (i) differ from the general circumstances of the projects covered by a particular categorical exemption, and (ii) those circumstances create an environmental risk that does not exist for the general class of exempt projects." (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1207 [61 Cal.Rptr.2d 447].)

▉▉▉ The trial court found that Wollmer did not present any substantial evidence of unusual circumstances that would prevent resort to the categorical exemption. Where, as here, the agency establishes that the project comes within an exemption, the burden shifts to the party challenging the exemption to show that one of the Guidelines section 15300.2 exceptions applies. (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 261 [42 Cal.Rptr. 537].) The challenger must bring forth substantial evidence that the project has the potential for a substantial adverse environmental impact. (*Ibid.*) Our job is to ask if the record reveals substantial evidence of a fair argument that there could be a significant effect on the environment. (*Id.* at p. 268.)

As he did below, on appeal Wollmer argues that the location of the project at the intersection of two major thoroughfares, and his view of the City's traffic modeling, qualify as substantial evidence of an unusual circumstance within the meaning of Guidelines section 15300.2.

### a. *Location*

▉▉▉ Wollmer has expressed his opinion that the project's location at the intersection of Ashby and San Pablo Avenues is an unusual circumstance. However, a lay opinion is not substantial evidence. "Unsubstantiated opinions, concerns, and suspicions about a project, though sincere and deeply felt, do not rise to the level of substantial evidence supporting a fair argument of

significant environmental effect." (*Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1352 [272 Cal.Rptr. 372].) Wollmer seems to think that unusual circumstances exist because in addition to being an intersection of two major city streets, the intersection is the sole intersection in Berkeley of two state highways, and thus Caltrans (California Department of Transportation) has "jurisdiction" over certain decisions. We fail to see how the actual or potential involvement of Caltrans in the general area of the project is an "unusual circumstance[]" that creates an environmental risk.

More to the point, his opinion is off base. The class of projects here is "In-Fill Development Projects." (Guidelines, § 15332.) To fit the class 32 exemption, the project must be situated within city limits on a site not exceeding five acres that is *substantially surrounded* by urban uses, and must be adequately served by required utilities and public services. (*Id.*, subds. (b), (e).)

With these criteria in mind, locating an in-fill project at the intersection of two major city streets that also happen to serve as state highway routes is well within the range of characteristics one would except for class 32 projects and precisely what the law encourages. The location is not an "unusual circumstance," let alone a circumstance creating an environmental risk that does not generally exist for other in-fill projects.

 b. *Traffic Study Model*

 i. *Background*

The City retained a traffic consulting firm to conduct a traffic impact study for the proposed project. The study employed a traffic model that was developed as part of the West Berkeley Circulation Master Plan. As explained in the study, this traffic model "estimates the percentage reduction in vehicle trips to account for walk, bicycle and transit trips. The transit/walk/bicycle trip reduction rates were provided by City staff for both residential and commercial trips based on the traffic model." The study additionally noted that "[a] mixed-use development typically generates fewer peak hour vehicle trips than those generated by comparable single-use developments, in this case due to internal trip matching between residential and retail uses. Furthermore, the project site is located on a transit-rich corridor that includes the AC Transit Rapid and local bus lines on San Pablo Avenue." Specifically, the study applied trip reduction factors of 48 percent on weekdays and 22 percent on weekends for residential trips, and 14 percent for both weekday and weekend commercial trips.

Below, Wollmer attacked the City's traffic modeling, to no avail. The trial court concluded he offered only his lay opinion, which did not qualify as substantial evidence of an unusual circumstance such as to defeat the class 32 exemption.

### ii. *Analysis*

Wollmer continues to critique the model, contending that the study's reliance on staff-provided trip reduction factors of 48 percent (weekdays) and 22 percent (weekends) for transit/walk/bicycle use "constitutes substantial evidence to support a fair argument of the 'possibility' of significant environmental effects from the Project." While his argument is less than clear, it appears that Wollmer seems to think that the traffic study in effect combined two separate traffic models to derive a trip reduction factor. Wollmer has offered his personal, lay opinion that the City and traffic consultant overlaid trip reduction factors to result in an excessive rate reduction factor. This technical assertion and accusation, made by a layperson with no countervailing support from a qualified expert, does not rise to the level of substantial evidence supporting a fair argument of a reasonable possibility that the project will have a significant effect on the environment due to unusual circumstances. (See *Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1352.) Wollmer's hostility to the decision of the City and its experts to use a reduction factor is nothing more than argument and unsubstantiated opinion. What is lacking are the facts, reasonable assumptions predicated on the facts, and expert opinion supported by the facts. (Pub. Resources Code, § 21082.2, subd. (c).)

### 3. *No CEQA Mitigation*

Finally, Wollmer charges the City with evading CEQA's extensive protections by in essence cutting a deal with the Developers whereby the Developers would dedicate land for a left turn lane on Ashby Avenue, thereby reducing traffic impacts to less than significant, a necessary condition for the class 32 exemption. We agree with the trial court that the City did not mitigate the project into qualifying for a categorical exemption. Rather, it properly exercised discretion to find it would not cause a significant traffic impact. As the lower court found, the dedication of a five-foot right-of-way, enabling the City to improve the San Pablo and Ashby Avenues intersection, was not a CEQA mitigation measure for project impacts, but a component of the project that assisted the City with an existing traffic issue.

Comments by the City's traffic engineer staff on the draft traffic study indicated a need to explore alternatives to the Carrison Street/San Pablo intersection, and also the possibility of a westbound left turn lane which was "considered the City's highest priority for intersection improvements." Assuming this latter comment refers to the San Pablo and Ashby Avenues intersection, as Wollmer suggests, it is true that by the time of the final traffic study, the Developers had made the dedication offer and that reality was included in the traffic analysis. Our response is, so what? The point is, the offer of dedication did become part of the project design, improving an existing traffic concern. This is no secret. The revised applicant statement for July 2008 specifically noted that during the first half of 2008, the project underwent "several programmatic and architectural revisions to improve its contribution to the community," including the Ashby Avenue left turn lane dedication. And further: "The applicant and city staff have been working diligently for the past several months to understand and address both the existing traffic issues, and also the long term effects of the proposed project ad [*sic*] San Pablo corridor development *in general*. The future installation of the left turn lane will create a much improved situation for the intersection *in general*, and especially on Ashby Avenue during peak hours." (Italics added.)

Wollmer offers no authority for the proposition that a positive effort between developers and a municipality to improve the project for the benefit of the community and address existing traffic concerns somehow becomes an evasion of CEQA. *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1108 [23 Cal.Rptr.3d 321] (*Salmon Protection*) is of no help. There, the county found that the proposed construction of a home within a riparian area deemed of critical concern was categorically exempt from CEQA. In the process, it found there was no reasonable possibility of significant adverse impacts. However, in arriving at this ultimate conclusion, the county relied on proposed mitigation measures to grant the categorical exemption. (*Salmon Protection, supra,* at pp. 1106–1108.) The appellant there argued that it was okay to rely on proposed mitigation measures in deciding whether the project was eligible for a categorical exemption, if those measures were included in the initial project application. The reviewing court said no, that reliance on mitigation measures, whether in the application or later adopted, involves an evaluative process that must be conducted under established CEQA procedures. (*Salmon Protection, supra,* at p. 1108.)

Here, the Developers dedicated land for a left turn lane. Unlike the situation in *Salmon Protection*, the traffic situation improved by the Developers' dedication preexisted the proposed project. The dedication became *part of* the project design—it was never a *proposed* mitigation measure.

## III. DISPOSITION

The judgment is affirmed in its entirety.

Ruvolo, P. J., and Sepulveda, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 15, 2011, S192951.