Filed 6/16/14  Lookout Point Alliance v. City of Newport Beach CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LOOKOUT POINT ALLIANCE et al., | |
| Plaintiffs and Appellants, | G048729 |
| v. | (Super. Ct. No. 30-2012-00588419) |
| CITY OF NEWPORT BEACH, | O P I N I O N |
| Defendant and Respondent; | |
| THE JOHN GUIDA TRUST et al., | |
| Real Parties in Interest. | |

Appeal from a judgment of the Superior Court of Orange County, Kim Garlin Dunning, Judge.  Affirmed.

Miles Law Group and Stephen M. Miles for Plaintiffs and Appellants.

Rutan & Tucker, John A. Ramirez and Robert O. Owen for Defendant and Respondent.

Allen Matkins Leck Gamble Mallory & Natsis, K. Erik Friess and Nicholas S. Shantar for Real Parties in Interest.

Plaintiffs Lookout Point Alliance and the Juaneño Band of Mission Indians, Acjachemen Nation (collectively and in the singular "LPA") appeal from the judgment denying a petition for a writ of mandamus under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)[1] LPA challenged the City of Newport Beach's (City) approval of a lot merger application filed by owners of two adjoining lots, the John Guida Trust and the Julie Guida Trust (the Guidas), who have demolished the original houses and intend to build a single home on the newly merged lot. LPA raise numerous contentions including the City failed to comply with CEQA, the City's Coastal Land Use Plan adopted pursuant to the California Coastal Act (§ 30000 et seq., the Coastal Act), and its lot merger ordinance contained in the Newport Beach Municipal Code (the Municipal Code). We reject LPA's arguments and affirm the judgment.

FACTS AND PROCEDURE

The Guidas own two adjoining lots in the City's Corona Del Mar community on Ocean Boulevard across the street from Lookout Point and Little Corona Beach.[2] The lot located at 2808 Ocean Boulevard was 7,217 square feet in size and 40 feet wide (at its widest point). The lot located at 2812 Ocean Boulevard was 6,483 square feet in size and also 40 feet wide. When the Guidas bought the two lots each was developed with a one-story house under 1,500 square feet in size. The Guidas planned on demolishing the existing houses, merging the two lots, and building a new house.

---

[1]       All statutory references are to the Public Resources Code, unless otherwise indicated. The CEQA implementing guidelines appear at California Code of Regulations, title 14, section 15000 et seq., and will be referred to as the "Guidelines."

[2]       Throughout the record the lot merger is referred to as the merger of two lots with two separate addresses. The legal description actually encompasses portions of three lots bearing two separate assessor's parcel numbers, but we will continue to refer to the merger as encompassing the two lots.

The City's general plan designates the subject property as single-unit residential detached (RS-D) and its zoning ordinance designates the subject property as single-unit residential (R-1). Development standards for the R-1 zone require interior lots be a minimum of 5,000 square feet and a minimum of 60 feet wide by 80 feet deep. The zoning ordinance sets a density/intensity limit of one single-unit detached dwelling for each legal lot.

Because the subject property is located in a coastal zone, it is also subject to the City's Coastal Land Use Plan (CLUP), adopted pursuant to the Coastal Act. The residential neighborhood where the subject property is located (old Corona del Mar) is identified in the CLUP as being in the single-unit residential detached "B" category (RSD-B). The CLUP describes RSD-B residential neighborhoods as having a "density/intensity" range ("[t]he RSD category applies to a range of detached single-family residential dwelling units on a single legal lot . . . .") of 6.0 to 9.9 dwelling units per acre [DU/AC]. The property is also subject to private deed restrictions concerning the height of structures on the property.

Additionally, coastal zone developments often have permit requirements from both the local agency and the California Coastal Commission (the Commission). But the Commission's Categorical Exclusion Order E-77-5 (Newport Beach) (hereafter CEO-E-77-5), excludes from the Commission's permit requirement the demolition and construction of single-family homes that meet certain development standards. When utilizing the categorical exclusion, the City must give five days' written notice to the Commission that it has approved a development that conforms to CEO-E-77-5.

*The Zoning Administrator Approves the Lot Merger*

On July 7, 2011, the Guidas applied to the City to have the two lots merged into a single lot. As merged, the new lot would be approximately 13,700 square feet, approximately 74 feet wide at the front on Ocean Boulevard, 80 feet wide at the back, and 180 feet deep.

A public hearing on the proposed lot merger was held before the City's Zoning Administrator on September 14, 2011. Several neighbors opposed the application, largely voicing concerns the merger would result in an over-large lot, and allow the Guidas to construct a house that would violate the private deed restrictions and damage views from neighboring properties. The Zoning Administrator observed the pending application was strictly for the lot merger, and the application had nothing to do with the design of the proposed house. The Zoning Administrator also observed that while the new lot would be large, there were many other similarly sized lots in the area. He specifically observed there was one property about five blocks away that involved the merger of four lots into one.

The Zoning Administrator approved the lot merger. His written findings included that the merger qualified for a class 5 categorical exemption from environmental review under CEQA because it involved minor alterations in land use limitations; the lots as merged would comply with the zoning ordinance because it would meet the minimum lot width and area standard, it would comply with the general plan because it would provide for a single-family residence, and it was within the 6.0-9.9 dwelling units per acre density range described by the CLUP. He found the new lot would be consistent with other nearby lots and would not result in an excessively large lot compared to many other existing lots in the area.

On September 23, 2011, the Guidas' neighbors appealed the Zoning Administrator's approval of the lot merger application to the City's Planning Commission. The stated reasons for the appeal were that the lot merger would allow the Guidas to violate the current deed restrictions by building a building that was too tall, and would damage their properties by loss of their views.

*Demolition Permits are Issued*

The Guidas had also applied for demolition permits to tear down the existing structures on the two lots. On September 27, 2011, the City issued its

4

CEO-E-77-5 notice to the Coastal Commission that it intended to issue the demolition permits, and the demolition permits were issued on October 11, 2011. Neither LPA nor any other person filed an administrative challenge to the issuance of the demolition permits. (See Municipal Code §§ 15.80.010 et seq. [administrative appeals process].) The demolition permits were valid for 180 days, and originally set to expire on April 18, 2012. The Guidas applied for and were granted an extension of the permits to October 11, 2012.

*The Planning Commission Appeal*

Following a public hearing on October 20, 2011, the Planning Commission overturned the Zoning Administrator's decision and denied the Guidas' lot merger application. The Planning Commission found the lot merger would create a lot size and configuration that was inconsistent with the development pattern of the surrounding neighborhood. It also found the merger would allow development that was incompatible with the size and mass of structures on neighboring properties. The Guidas appealed the Planning Commission's decision to the City Council.

*The City Council Appeal*

The first City Council hearing on the Guidas' appeal took place on January 24, 2012. The City staff reported the proposed lot merger qualified for a class 5 (minor land alterations) categorical exemption from CEQA review. At the hearing, the Guidas' representative explained they were working on redesigning their house and were willing to record a covenant imposing design restrictions as to size and mass that were more stringent than required by the City's zoning ordinance. The Guidas requested the matter be referred back to the Planning Commission to consider appropriate design restrictions. Several neighbors continued to object to the lot merger arguing the lot size would be incompatible with the area. The City Council voted to send the matter back to the Planning Commission to recommend approval or denial of the application based on the Guidas' proposed design restrictions.

5

*The Planning Commission Reconsiders Application*

On March 22, 2012, the Planning Commission reconsidered the lot merger application. The staff report explained the Guidas were proposing to abide by design restrictions that included reducing the floor area ratio of their new house by 33 percent from what the zoning ordinance would allow if the lots were merged (which was also a 25 percent reduction in size from what could be built on each lot if separately redeveloped), and reducing the allowable height by 33 percent. The Guidas additionally offered to increase the required setbacks by 33 percent.

Neighbors continued to oppose the lot merger on the grounds the resulting lot would be incompatible with the neighborhood. The Planning Commission adopted a resolution recommending the City Council approve the lot merger subject to a recorded convent restricting development as proposed by the Guidas.

*The Application Goes Back to City Council*

The Guidas' application went back before the City Council on April 24, 2012, but the hearing was continued to the May 8 to allow additional time to prepare a restrictive covenant. In its report for the May 8 hearing, the City's staff advised the lot merger was categorically exempt from CEQA review under class 5 (minor land alterations), class 1 (demolition of small structures/single-family residence) and class 3 (new construction of single-family residence). Staff also reported the lot merger would satisfy the CLUP's density/intensity range of 6.0-9.9 dwelling units per acre. The staff report compared lot sizes in the vicinity of the Guidas' property. It identified three nearby lots of comparable size: 13,326 square feet/66 feet wide; 10,049 square feet/78 feet wide; and 14,579 square feet/111 feet wide. The staff report identified numerous (at least 11) properties on Ocean Avenue that exceeded 8,000 square feet.

LPA's counsel appeared at the May 8 City Council hearing. He asserted the project was improperly defined as a lot merger, when in fact the project involved a lot merger, demolition of two houses, and construction of a new house. He stated the two

6

lots had "historically significant dwellings" (the first mention of the existing homes), which he described as "Eichler style structures," and thus he argued the project was not categorically exempt from CEQA review. The City Attorney explained each of the activities (lot merger, demolition, new construction) was categorically exempt "so the City is not piecemealing them." Additionally, the City Attorney explained, "We checked the historical records, there's no listing of it being a historical property in any of the registries . . . . [LPA's attorney] sort of speculates that there may be some historical value associated with these two properties and our thorough research of our records do[es] not reveal any of that and there's no evidence to that effect." Another project opponent complained the lot merger would result in a *decrease* in the density required by the CLUP—resulting in only 3.2 houses per acre, when the CLUP requires 6.0 to 9.9 houses per acre. City Council members responded that CLUP density applied over the entire area, not on a lot by lot basis. During the hearing, council members questioned if there was any room for further negotiation between the Guidas and the neighbors. The Guidas agreed to attempt further discussions with the neighbors and the hearing was continued to June 26.

On June 13, 2012, the Guidas exercised their demolition permits and the two houses were demolished.

A letter dated June 22, 2012, written by Ruth Alter, owner of an archeology consulting firm, is part of the administrative record. Alter wrote to LPA's counsel she had seen the two houses on June 2, 2012, and concluded the house at 2808 Ocean Boulevard "was likely the work of a quality designer or architect," but she could not attribute it to a specific individual without extensive research. Alter appeared at the June 26 hearing and explained she had only been asked by LPA "to do a basic preliminary opinion assessment of the two properties." She concluded there was nothing significant about the house at 2812 Ocean Boulevard. She described the house at 2808 Ocean Boulevard, as a "beautiful example" of "post and beam construction," which was a

7

rare architectural style "almost always associated with a master designer or a master architect." She did not identify any particular master designer or master architect associated with the house.

In its report for the June 26 hearing, City staff explained the houses on the two lots were demolished on June 13, pursuant to properly issued permits and because issuance of demolition permits is discretionary, it was not subject to CEQA. Staff advised the lot merger was categorically exempt under class 5 (minor land alterations) and class 15 (minor land division), and the redevelopment of the new lot would be entitled to a class 3 (new construction of single-family residence) categorical exemption.

As to the historical resources question, staff explained there was no information as to who designed the two houses. The City's permit history for the two lots established the houses were built between 1951 and 1953 by the J. Ray Construction Company; the permits did not name the architect or developer and there were no related construction plans, and the houses were not listed on the City's historic resources inventory list and not recognized as national, state, or local historical resources in the historical resources element of the City's general plan.

As to the CLUP density issue, the staff report explained the CLUP density range is representative of the predominant development of the entire area. The average lot size in the RSD-B area of old Corona del Mar was 4,846 square feet and the proposed lot merger would raise the average lot size to 4,857 square feet, which was within the density range.

The Guidas agreed to further development restrictions to be recorded on the merged lot. Any new house would be subject to a floor area limit of 7,116 square feet (not including subterranean basement which by city code is not included in the floor area limit), a height limit of 14 feet for the flat roof or top of the floor of the roof deck, front setback of 20 feet, rear set back of 10 feet and side setbacks of six feet. The Planning Director observed that unmerged and without the development restrictions under the

8

zoning ordinance the two lots would be subject to only three-foot setbacks, a 24 to 29 foot height limit, and up to 14,000 square feet combined of structures.

After closing the public hearing, the City Council, with one council member dissenting, adopted Resolution No. 2012-52 approving the Guidas' lot merger subject to conditions including acceptance of the development restrictions the Guidas offered. The City Council found the lot merger was exempt from CEQA under CEQA categorical exemptions classes 3, 5, and 15. It found the lot merger was consistent with the CLUP because it would not cause the maximum density range for the RSD-B area to increase. It found the new lot—80 feet wide and 13,678 square feet—would be consistent with the surrounding pattern of development and would not create an excessively large lot because other nearby lots on Ocean Boulevard have lot widths as wide as 73 feet and as large as 13,325 square feet. On June 28, 2012, the City posted its notice of exemption stating the lot merger was categorically exempt from CEQA review.

*The Petition for Writ of Mandate*

On August 2, 2012, LPA filed the instant petition for a writ of mandate seeking to set aside approval of the lot merger contending the City violated CEQA by finding the project was categorically exempt from CEQA review, violated its own lot merger ordinance, violated the density restrictions imposed by the CLUP, and violated the Coastal Act. The trial court rejected LPA's contentions and denied mandamus relief.

DISCUSSION

*1. Standard of Review*

LPA brought its petition for writ of mandate pursuant to Code of Civil Procedure sections 1085 and 1094.5, and Public Resources Code sections 21168 and 21168.5. "'In an action to set aside an agency's determination under [CEQA], the appropriate standard of review is determined by the nature of the proceeding below. . . . [S]ection 21168 "establishes the standard of review in administrative mandamus proceedings" under Code of Civil Procedure section 1094.5, while section 21168.5

9

"governs traditional mandamus actions" under Code of Civil Procedure section 1085. [Citation.] The former section applies to proceedings normally termed "quasi-adjudicative," "in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency. . . . " [Citations.] The latter section applies to all other actions taken pursuant to CEQA and generally encompasses "quasi-legislative" decisions made by a public agency. [Citations.]' [Citations.]

"The distinction, however, is rarely significant. In either case, the issue before the trial court is whether the agency abused its discretion. Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence. [Citations.]

"'[I]n undertaking judicial review pursuant to [s]ections 21168 and 21168.5, courts shall continue to follow the established principle that there is no presumption that error is prejudicial.' [Citation.] However, 'noncompliance with the information disclosure provisions of [CEQA] which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of [CEQA], may constitute a prejudicial abuse of discretion within the meaning of [s]ections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' [Citation.]

"On appeal, the appellate court's 'task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law.' [Citation.] The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. [Citations.]" (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1374-1376.)

2. *CLUP*

LPA contends the City Council abused its discretion by approving the lot merger because the construction of only one house on the 13,678 square foot lot would

10

result in a *lower* density/intensity of residential development than required by the CLUP for the RSD-B category. We reject its contention.

Because the subject property is located in a coastal zone it is subject to development restrictions imposed by the Coastal Act. The Coastal Act establishes a comprehensive framework for coastal planning. (§ 30000 et. seq.) It requires each local government having coastal property within its territory to prepare a Local Coastal Program to govern development in its coastal zone. (§§ 30108.6 & 30510.) A Local Coastal Program is comprised of the CLUP (Coastal Land Use Plan), which functions as the general plan for the coastal zone, and the CLUP implementation measures that include the zoning, zoning maps, and implementing actions for the coastal zone. (§§ 30108.5, 30108.6.)

The Coastal Commission first approved the City's CLUP in 2005. It "sets forth goals, objectives, and policies that govern the use of land and water in the [City's] coastal zone . . . ." (CLUP, § 1.1.) If there are conflicts between the policies expressed in the City's CLUP and its general plan and zoning ordinance, "the policies of the [CLUP] shall take precedence. However, in no case, shall the policies of the [CLUP] be interpreted to allow a development to *exceed* a development limit established by the [g]eneral [p]lan or its implementing ordinances." (CLUP, § 1.3 (2), italics added.)

Chapter 2 of the City's CLUP addresses coastal zone land use and development policies. Section 2.1, provides, "The [CLUP] was derived from the Land Use Element of the General Plan and is intended to identify the distribution of land uses in the coastal zone. The Land Use Element may contain more precise development limits for specific properties. Should a conflict exist, the land use intensity or residential density limit that is most protective of coastal resources shall take precedence. However, in no case, shall the policies of the [CLUP] be interpreted to allow a development to *exceed* a development limit established by the General Plan or its implementing ordinances." (CLUP, § 2.1, italics added.)

11

Section 2.1.1 describes the coastal land use categories and describes the "type, density and intensity" of each land use. It begins by describing the categories of "Residential Neighborhoods" in the coastal zone, including four categories of single-unit residential detached (RSD), which "category applies to a range of detached single-family residential dwelling units on a single legal lot and does not include condominiums or cooperative housing." The four RSD categories are the RSD-A category, described as having 0.0 to 5.9 dwelling units per acre; the RSD-B category, described as having 6.0 to 9.9 dwelling units per acre; the RSD-C category, described as having 10.0 to 19.9 dwelling units per acre; and the RSD-D category, described as having 20.0 to 29.9 dwelling units per acre. The subject property is identified as being in the RSD-B category.

The gist of LPA's argument is that by describing the RSD-B residential neighborhood category as one having between 6.0 and 9.9 dwelling units per acre, the CLUP mandates that each lot must individually meet that development density/intensity requirement. Accordingly, although the zoning ordinance only specifies a *minimum* lot size of 5,000 square feet and imposes no maximum lot size, the CLUP effectively requires a minimum lot size in the RSD-B area of 4,400 square feet (i.e., 43,560 square feet in one acre divided by the high end of the density range 9.9 equals 4,400), and sets a *maximum* lot size of 7,260 (i.e., 43,560/6=7,260). Thus, LPA argues, the City cannot approve a lot merger that would result in any new lot larger than 7,260 square feet in the RSD-B area because it would result in a development density on that lot that is lower than the minimum 6.0 dwelling units per acre required by the CLUP (i.e., 43,560/13,678=3.2 dwelling units per acre).

When this argument was made before the City Council, City staff explained the CLUP density ranges were "representative of the predominant development of the entire area . . . ." Indeed, in the part of the CLUP pertaining to categorical exclusions from the coastal development permit provisions of the Coastal Act, the CLUP explains,

12

"The permitted residential unit type and maximum density of the [CLUP] reflect the predominate form of development in these areas." (CLUP, § 2.2.3.) The average lot size in the area was 4,846, and the merger would bring the average lot size up to 4,857, which kept the area in the specified density range. At the May 8, 2012, City Council meeting, one council member observed density was not viewed "on a lot-by-lot basis. . . . [D]ensity is something that's applied over the entire old town area of Corona del Mar, you have big lots. You have average lots, you've got small lots. So I think that density is meant to be applied over a much larger area, not a lot, not a block, but a much larger area . . . ." The City Council's findings in support of the resolution approving the lot merger (Resolution 2012-52) included a finding the merger was consistent with the applicable regulations including the CLUP. Among the facts supporting that finding were that the CLUP density range was representative of the predominant development in the entire old Corona del Mar area and the merger "does not cause the maximum density for the area to be exceeded."

We conclude the City reasonably interpreted its CLUP as describing the density range for the RSD-B area, by which a development must be additionally assessed, and not as imposing a maximum individual lot size so as to achieve a specific density range on an individual lot. The City's interpretation controls unless it is clearly erroneous. (See *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193 (*Anderson First Coalition*) ["'an agency's view of the meaning and scope of its own [zoning] ordinance is entitled to great weight unless it is clearly erroneous or unauthorized'"]; *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1015 [same]; see also *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2005) 128 Cal.App.4th 1195, 1205 [courts defer to an agency's interpretation of its own regulations].)

LPA relies on *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783 (*Pacific Palisades*), in support of its argument that a land

13

use approval that results in a decrease in the intensity of development constitutes a "change in density" that would violate the CLUP. *Pacific Palisades* held the conversion of a mobilehome park from tenant occupancy to resident ownership is a "development" for purposes of the Coastal Act, and thus subject to the Coastal Commission's permitting authority. The relevant provision in the Coastal Act, section 39106, defines a "'[d]evelopment,'" for which a coastal development permit would be required, as including a "change in the density or intensity of use of land, including, but not limited to . . . any . . . division of land, including lot splits . . . ." The property owner argued a mobilehome park conversion was not a "development" because it did not change the density or intensity of the land use. In rejecting that contention, the Supreme Court concluded an increase *or* decrease in intensity of the land use was a "change" constituting a "development." (*Pacific Palisades, supra,* 55 Cal.4th at p. 795.) The mobilehome park conversion from rental to resident ownership could theoretically decrease density/intensity of use "by limiting public access to the coastline or reducing the number of lots available for residential purposes . . . ." (*Ibid.*) And it could theoretically increase density/intensity of land use by "lead[ing] to problematic design features as owners express their individuality by decorating or adding to their mobilehomes. Nor is it impossible that owners would block public access to coastal areas or increase the number of residents in their units." (*Id.* at p. 797.)

We fail to see how *Pacific Palisades* furthers LPA's position. It dealt with the proper interpretation of a statute, not with how a local agency interprets and applies its own land use implementing documents. *Pacific Palisades* offers no guidance on whether the City's conclusion its CLUP's description of the applicable density/intensity range for a residential neighborhood is viewed in a macro sense (the range for the entire area) or a micro sense (the exact density that must be achieved on each individual lot).

LPA also relies on *deBottari v. City Council* (1985) 171 Cal.App.3d 1204 (*deBottari*), for the proposition that "simple mathematics" must be applied to determine

14

whether "general plan and zoning densities" are consistent. In *deBottari*, a city approved a general plan amendment of the land use designation from one allowing zero to two residential units per acre, to one allowing three to four. It also approved a zoning ordinance amendment changing the minimum lot size from 18,000 square feet (about two units per acre) to 10,000 square feet (about four units per acre). (*Id.* at p. 1207.) The city subsequently refused to place on the ballot a proposed referendum petition that sought to repeal the zoning ordinance amendments and revert to the original zoning. (*Id.* at p. 1208.) The court held the referendum petition was properly rejected. The referendum, had it passed, would have resulted in an invalid zoning ordinance because it would have conflicted with the amended general plan. (*Id.* at p. 1213.)

Again, we fail to see how *deBottari, supra,* 171 Cal.App.3d 1204, aids LPA. There is no inconsistency between the City's interpretation of its LCUP, which describes a density range for the RSD-B area, its general plan designation of single-family residential, and its zoning ordinance which requires a minimum lot size of 5,000 square feet.

If anything, LPA's "simple math"/consistency argument underscores why the City's interpretation of its CLUP is reasonable and LPA's is not. LPA's argument is premised on their assumption that by describing a density range for the residential neighborhood category, by applying simple math, a *maximum* individual lot size can be extrapolated. In the case of the RSD-B area, LPA contend because the low end of the density range is 6.0 dwelling units per acre, the *maximum* lot size is 7,260 square feet. (We note the City's staff identified numerous properties on Ocean Avenue in the CLUP's RSD-B area that exceeded 8,000 square feet.) Consistency requires the same simple math be applied to the CLUP's other residential neighborhood categories. That would mean in the RSD-C area, described as having a density range of 10 to 19.9 dwelling units per acre, the *maximum* legal lot size would be 4,356 square feet—even though the City's zoning ordinance sets a *minimum* legal lot size of 5,000 square feet (or 6,000 square feet

15

for a corner lot).  And in the RSD-D zone, with a density range of 20 to 29.9 dwelling units per acre, applying LPA's reasoning, the *maximum* legal lot size would be 2,178 square feet or roughly one-third to one-half of the *minimum* legal lot size specified by the zoning ordinance.  LPA's interpretation would render the CLUP irreconcilable with the zoning ordinance—with one setting a maximum lot size well below the minimum lot size required by the other.  The City's interpretation avoids such an absurdity.  In short, the City correctly determined the lot merger would not run afoul of the CLUP because after accounting for the larger lot, the housing density in the area remained within the CLUP's density range.

*3.  CEQA Issues*

LPA attacks the City's findings the lot merger was categorically exempt from CEQA review.  We reject its contentions.

*a.  CEQA Background*

"[T]he Legislature intended CEQA to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.  [Citation.]  Central to CEQA is the EIR, which has as its purpose informing the public and government officials of the environmental consequences of decisions before they are made.  [Citation.]" (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1315 (*Sierra Club*).)  "An EIR must be prepared on any 'project' a local agency intends to approve or carry out which 'may have a significant effect on the environment.'  (§§ 21100, 21151; Guidelines, § 15002, subd. (f)(1).)  The term 'project' is broadly defined and includes any activities which have a potential for resulting in physical changes in the environment, directly or ultimately.  (§ 21065; Guidelines, § 15002, subd. (d), 15378, subd. (a); [citation].)" (*Sierra Club*, *supra,* 6 Cal.App.4th at p. 1315, fn. omitted.)  A "'significant effect on the environment' " is defined as "a substantial, or potentially substantial, adverse change in any of the physical conditions

16

within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15382.)

Not all projects are subject to CEQA. "CEQA authorizes the resources agency to adopt guidelines that list classes of exempt projects, namely projects 'which have been determined not to have a significant effect on the environment and which shall be exempt from this division.' ( . . . § 21084, subd. (a).) These classes of projects are called 'categorical exemptions' and are detailed in Guidelines section 15300 et seq." (*Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329, 1347 (*Wollmer*).) Where a public agency decides that proposed activity is categorically exempt and no exceptions apply, a notice of exemption is filed, and no further environmental review is necessary. (Guidelines, § 15062, subd. (a); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74.) But the categorical exemptions have exceptions and qualifications. (*Wollmer, supra,* 193 Cal.App.4th at p. 1347.) As relevant here, the exceptions include that a categorical exemption may not be used for an activity or project "where there is a reasonable possibility that [it] will have a significant effect on the environment due to unusual circumstances[,]" or if it "may cause a substantial adverse change in the significance of a historical resource." (Guidelines, § 15300.2, subds. (c) & (f).)

 b.  *Categorical Exemptions*

The City found the lot merger was exempt from CEQA review under Guidelines section 15305 (class 5), which applies to any "minor alterations in land use limitations in areas with an average slope of less than 20%, which do not result in any changes in land use or density, including but not limited to:  [¶] (a) Minor lot line adjustments, side yard, and set back variances not resulting in the creation of any new parcel; [¶] (b) Issuance of minor encroachment permits; [or] (c) Reversion to acreage in accordance with the Subdivision Map Act."  Additionally, the City found the lot merger was exempt under Guidelines section 15315 (class 15), which applies to "the division of property in urbanized areas zoned for residential . . . use into four or fewer parcels when

17

the division is in conformance with the General Plan and zoning, no variances or exceptions are required, all services and access to the proposed parcels to local standards are available, the parcel was not involved in a division of a larger parcel within the previous 2 years, and the parcel does not have an average slope greater than 20 percent." The City also found, to the extent the lot merger approval precedes construction of a new residence, it was exempt under Guidelines section 15303 (class 3), which applies to "construction and location of limited numbers of new, small facilities or structures," an exemption that specifically includes "one single-family residence," on a legal parcel in a residential zone."

"'[T]he substantial evidence test governs our review of the [agency's] factual determination that a project falls within a categorical exemption.' [Citation.]" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1381-1382; *Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1187.) Below and on appeal, LPA address only the applicability of the class 5 exemption. As the trial court noted in its statement of decision, at trial, LPA "barely acknowledge [the class 15] exemption and have not challenged it on the merits."

LPA argues the class 5 exemption can only be applied if the lot merger will "not result in any changes in land use or density." It argues the lot merger will result in a change in density because it will decrease the density of development on the lot *below* that required by the CLUP. We have already addressed and rejected the faulty premise for LPA's reasoning above. The City found the lot merger would not change the land use or density because the merged lot remained within the general plan (and zoning ordinances) single-unit residential detached zoning designation. Additionally, there was no change in density because as merged the lot was consistent with the 6.0-9.9 dwelling units per acre density/intensity range called for in the CLUP. Substantial evidence supports its finding the class 5 exemption applied.

18

Even were we to agree with LPA that the class 5 exemption did not apply, as we have noted it has not challenged the City's application of the class 15 exemption to the lot merger. Nor has it challenged the City's determination the class 3 exemption applies to any new construction on the merged lot. Accordingly, LPA has waived any argument those categorical exemptions do not apply.

Moreover, in their respondents' briefs on appeal, the City and the Guidas point out there are several other applicable categorical exemptions beyond those listed in the City's notice of exemption. (These additional categorical exemptions were also raised by the City and the Guidas in the trial court and most were mentioned in the various staff reports contained in the administrative record.) (See *California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 190-191 [agency may rely on additional categorical exemptions if there is no claim or showing of prejudice].) LPA does not reply to the City's and the Guidas' arguments concerning the applicability of these categorical exemptions. The demolition of the original houses was categorically exempt under Guidelines section 15301, subdivision (*l*) (class 1), which applies to "[d]emolition and removal of individual small structures listed in this subdivision; [¶] (1) One single-family residence. In urbanized areas, up to three single-family residences may be demolished under this exemption." The demolition of the original houses and construction of a new house is categorically exempt under Guidelines section 15302 (class 2), which applies to "replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and will have substantially the same purpose and capacity as the structure replaced." And the demolition, lot merger, and reconstruction of the houses were categorically exempt under Guidelines section 15332 (class 32), which "consists of projects characterized as in-fill development" provided the project is consistent with the general plan and zoning, is on a site of no more than five acres substantially surrounded by urban uses, the site is not an endangered species habitat, there will be no significant

19

effects relating to traffic, noise, air quality, or water quality, and the site can be adequately served by all required utilities and public services.

In sum, there is substantial evidence supporting the City's determination the lot merger application was categorically exempt from CEQA review. Accordingly, we turn to the issue of whether an exception to categorical exemption applied.

 *c. Historical Resources Exception*

LPA contends that even if one of the foregoing categorical exemptions applies, the "historical resources" exception precludes the use of a categorical exemption to avoid CEQA review in this case. We disagree.

If an agency finds, """"based on substantial evidence in the record, that the project falls within a categorical exemption,"""" a party challenging that finding must present evidence an exception to the exemption is applicable. (*Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 855 (*Hines*).) As relevant, Guidelines section 15300.2, subdivisions (c) and (f), provides a categorical exemption cannot be used "where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances" or for "a project which may cause a substantial adverse change in the significance of a historical resource." Although LPA refers to both the unusual circumstances and the historical resources exception, they analyze only the latter.

"There is a split of authority on the appropriate standard of judicial review of a question of fact when the issue is whether a project that would otherwise be found categorically exempt is subject to one of [the] . . . exceptions. . . . 'Some courts . . . hold[] that a finding of categorical exemption cannot be sustained if there is a "fair argument" based on substantial evidence that the project will have significant environmental impacts, even where the agency is presented with substantial evidence to the contrary. [Citation.] Other courts apply an ordinary substantial evidence test . . . deferring to the express or implied findings of the local agency that has found a categorical exemption

20

applicable. [Citations.]'" (*Hines, supra,* 186 Cal.App.4th at pp. 855-856.) The question of the correct standard is currently pending before our Supreme Court. (*Berkeley Hillside Preservation v. City of Berkeley*, rev. granted May 23, 2012, S201116.) We need not resolve this issue because even applying the less deferential "fair argument" standard, we find there is simply no substantial evidence to support LPA's contention the historical resources exception applies.

Preliminarily, we fail to see why LPA's argument the original houses were historical resources is not moot, given they were demolished pursuant to validly issued demolition permits that were not timely challenged by LPA. LPA, in passing, asserts that even though houses were demolished, a reconstructive historical survey could be performed to assess their importance (i.e., a "paper reconstruction"). And because the City did not address historical significance of the two houses, the magnitude of the impact of their demolition remains in question. But as the trial court recognized at the hearing below, given that issuance of the demolition permits was a ministerial act, they were not challenged, and were lawfully acted upon, "I don't think you can come back today and after something has been pulverized say, well, it was historical."

Moreover, even if the original houses still stood, LPA could not prevail. As noted above, "[a] categorical exemption shall not be used for a project which may cause a substantial adverse change in the significance of a historical resource." (Guidelines, § 15300.2, subd. (f).) As observed in *Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039, 1051 (*Valley Advocates*), there are three relevant categories: "(1) mandatory historical resources, (2) presumptive historical resources and (3) discretionary historical resources." To qualify as a mandatory or presumptive historical resource, the structures must have been listed on state or local registers of historical resources, or identified as historically significant in an historical resources survey. (*Id.* at pp. 1051-1054; § 21084.1; Guidelines, § 15064.5.) It is undisputed the original houses met none of the requirements to be considered mandatory or presumptive

21

historical resources. They were not listed on any national, state, or local list of historical resources, nor were they on any survey of historical resources.

LPA apparently relies on the City's discretion to consider a structure as a historical resource even if not officially designated as such. But that category does not apply because there is no substantial evidence to support LPA's contention the houses were historical resources. The only pre-demolition evidence came at the May 8, 2012, City Council meeting, when counsel for LPA claimed the two lots had "Eichler style structures" on them and therefore were "historical resource[s]." In response, the City Attorney explained, "We checked the historical records, there's no listing of it being a historical property in any of the registries . . . [Petitioners' attorney] sort of speculates that there may be some historical value associated with these two properties and our thorough research of our records do[es] not reveal any of that and there's no evidence to that effect." The houses were demolished on June 13, 2012, pursuant to the validly issued and unchallenged demolition permits. In a letter dated June 22, LPA's expert, Alter, wrote to Petitioners' counsel the house at 2808 Ocean Boulevard was "likely the work of a quality designer or architect," but she could not identify any particular designer or architect. At the June 26 hearing, Alter stated the house at 2812 Ocean Boulevard was nothing extraordinary, but the house at 2808 Ocean Boulevard was a "beautiful example" of "post and beam construction," an architectural style "almost always associated with a master designer or a master architect," but again she did not identify any particular master designer or master architect associated with the house. LPA's post-demolition evidence the houses were a style of architecture normally associated with a "master designer or master architect" is not substantial evidence the houses had any historical significance or were historical resources. In its report for the June 26 hearing, City staff explained the City's permit history for the two lots showed the houses were built between 1951 and 1953 by the J. Ray Construction Company, there was no record containing the name of the developer or architect, the houses were not listed on the

22

City's Historic Resource Inventory or lists compiled by the City's Ad Hoc Historic Preservation Advisory Committee, and the houses were not recognized as national state or local historical resources in the City's Historical Resources Element of the General Plan. The City was entitled to rely on the expertise of planning staff (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 901), and it was not required to apply the historical resources exception to the categorical exemptions from further CEQA review of the lot merger application.

 *d. Piecemealing*

LPA's final CEQA argument is one of improper project "piecemealing." They accuse the City of improperly considering the demolition of the existing houses separately from the lot merger application so as to avoid CEQA review.

Ordinarily issuance of a building or demolition permit is a ministerial project and exempt from CEQA. (*Adams Point Preservation Society v. City of Oakland* (1987) 192 Cal.App.3d 203, 206-208; Guidelines, § 15268.) But LPA argues the project should be viewed as the demolition and the lot merger combined. And because approval of the latter was a discretionary action, the entire project was discretionary and thus subject to CEQA. (See Guidelines, §§ 15268, subd. (d) ["Where a project involves an approval that contains elements of both a ministerial action and a discretionary action, the project will be deemed to be discretionary and will be subject to the requirements of CEQA"], 15378, subd. (a) ["'[p]roject' means the whole of an action, which has a potential for resulting in either a direct [or indirect] physical change in the environment"], 15378, subd. (c) ["project" means the *activity* being approved and not each separate governmental approval].) LPA asserts the demolition was improperly segregated from the lot merger to avoid CEQA review.

Although an agency cannot divide a project into separate parts to avoid CEQA review, when each aspect is categorically exempt the combined effect of the exemptions places the entire project outside the scope of CEQA. (*California Farm*

23

*Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 191; see *Surfrider Foundation v. California Coastal Com.* (1994) 26 Cal.App.4th 151, 155 ["Commission's action was exempt from CEQA due to the combined application of two types of exemptions"].)  Here, even if viewed as discretionary rather than ministerial, the demolition of the two houses was categorically exempt (see Guidelines, § 15301, subd. (*l*) [class 1 exemption for demolition and removal of individual small structures including up to three single-family residences in urbanized areas]), and as already explained there is no substantial evidence the houses were historical resources so as to require application of any of the exceptions to application of those categorical exemptions.  Similarly, as already explained the lot merger was categorically exempt.  LPA offers no explanation as to why the combined effect of the categorical exemptions would not take the project, as defined by LPA, out of CEQA's scope.[3]

*4.  Violation of City's Lot Merger Ordinance*

LPA argues approval of the lot merger violated the City's lot merger ordinance codified in Municipal Code chapter 19.68.  The argument is completely unsupported by any citation to legal authorities or any cogent analysis.  Instead, LPA refers us to the "well developed" argument it included in its opening brief filed in the trial court (which we note consisted of a scant 11 sentences and was similarly unsupported by citation to authority or legal analysis).  For that reason alone, we consider the argument waived.  "'Appellate briefs must provide argument and legal authority for the positions taken.  "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."'  [Citation.]  'We are not bound to develop appellants' argument for them.  [Citation.]  The absence of cogent legal argument or citation to authority allows this court to treat the contention as

_____

[3]     For this reason, we need not consider the Guidas' argument LPA failed to exhaust administrative remedies as to the demolition permits, or that any challenge to them is untimely.

24

waived.' [Citations.]" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*).)

Moreover, the argument is without merit. In its opening brief LPA specifically refers to the required findings that "[t]he lots as merged will be consistent with the pattern of development nearby and will not result in a lot width, depth or orientation, or development site that is incompatible with nearby lots[,]" and "[a]pproval of the [lot] merger will not . . . be detrimental or injurious to property and improvements in the neighborhood or the general welfare of the City[.]" (Mun. Code § 19.68.030 (H)(1) & (5).) The gist of its argument seems to be because the Planning Commission originally found those findings could not be made, and that conclusion was later reached by the one dissenting council member, the City Council could not make the requisite findings.

But in its resolution approving the lot merger, the City Council made all findings required by its lot merger ordinance.[4] As to the findings raised by LPA, the City

---

[4] Municipal Code section 19.68.030 sets forth the findings required for approval of a lot merger. They include: "1. Approval of the merger will not, under the circumstances of this particular case, be detrimental to the health, safety, peace, comfort and general welfare of persons residing or working in the neighborhood of such proposed use or be detrimental or injurious to property and improvements in the neighborhood or the general welfare of the City, and further that the proposed lot merger is consistent with the legislative intent of [this title]; and [¶] 2. The lots to be merged are under common fee ownership at the time of the merger; and [¶] 3. The lots as merged will be consistent or will be more closely compatible with the applicable zoning regulations and will be consistent with other regulations relating to the subject property including, but not limited to, the General Plan and any applicable Coastal Plan or Specific Plan; and [¶] 4. Neither the lots as merged nor adjoining parcels will be deprived of legal access as a result of the merger; and [¶] 5. The lots as merged will be consistent with the surrounding pattern of development and will not create an excessively large lot that is not compatible with the surrounding development. In making this finding, the review authority may consider the following: [¶] Whether development of the merged lots could significantly deviate from the pattern of development of adjacent and/or adjoining lots in a manner that would result in an unreasonable detriment to the use and enjoyment of other properties. [¶] Whether the merged lots would be consistent with the character or general orientation of adjacent

25

Council found approval of the lot merger would not be detrimental or injurious to property and improvements in the neighborhood or the general welfare of the City because future development would comply with the zoning ordinance development standards, the merger would not impact public views of the ocean (because no public views existed), the merger would result in a legal building site, the merger would not result in creation of additional parcels, and there would be no change in land use or increase in density. The City Council also found the lots as merged would be consistent with the surrounding pattern of development and would not create an excessively large lot or a lot that was incompatible with the surrounding development because the area lots were of "varying shapes and sizes"; as merged, the subject lot would have a "width of 80 feet and area of 13,678 square feet"; and "[o]ther nearby lots on Ocean Boulevard have lot widths as wide as 73 feet and area as large as 13,325 square feet." We must accord great deference to the City's findings the lot merger is consistent with its Municipal Code. (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1192.) LPA has failed to carry its burden to demonstrate the City's findings are unsupported by the record.[5]

5. *Coastal Act*

LPA contends approval of the lot merger violated the Coastal Act. The argument is completely devoid of any legal analysis or citation to authority—LPA does not cite a single provision of the Coastal Act or explain how it was violated by approval of the lot merger. Although LPA refers to the Commission's CEO-E-77-5 excluding the demolition and construction of single-family homes from Coastal Commission review,

and/or adjoining lots. [¶] Whether the merged lots would be conforming or in greater conformity with the minimum lot width and area standards for the zoning district."

[5] In their reply brief, LPA asserts the other large lots in the area all predate the City's lot merger ordinance and its CLUP, and this lot will be the largest created by a merger. They cite no evidence in the administrative record to support this claim.

26

they have failed to offer any explanation as to how the Coastal Act has been violated. Accordingly, we treat the argument as waived. (*Cahill, supra,* 194 Cal.App.4th at p. 956 ["'We are not bound to develop appellants' argument for them'"].)

*6. Augmentation of Administrative Record*

Finally, in a three-sentence argument, LPA contends the trial court abused its discretion by denying its request to augment the administrative record. It offers absolutely no explanation as to what documents it sought to add or what relevance they had to the issues below. There is no legal analysis as to whether the documents were items that should have been included on in the administrative record in the first instance (see § 21167.6, subd. (e) [describing contents of administrative record]), other than LPA's single sentence stating there is no evidence in the administrative record demonstrating the documents were not among the documents submitted to the City. More significantly, it offers no explanation as how it was prejudiced by the absence of the unidentified documents from the administrative record. The argument is waived. (*Cahill, supra,* 194 Cal.App.4th at p. 956.)

DISPOSITION

The judgment is affirmed. Respondents and Real Parties in Interest are awarded their costs on appeal.

O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.

27