Filed 1/7/22; Certified for Publication 2/2/22 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BANKERS HILL 150 et al., | D077963 |
|     Plaintiffs and Appellants, | |
|     v. | (Super. Ct. No. 37-2019-00020725-CU-WM-CTL) |
| CITY OF SAN DIEGO, | |
|     Defendant and Respondent; | |
| GREYSTAR GP II, LLC, et al., | |
|     Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge. Affirmed.

Delano and Delano, Everett L. DeLano III, for Plaintiffs and Appellants.

Mara W. Elliot, City Attorney, George Schaefer, Assistant City Attorney, Jana M. Will and M. Travis Phelps, Deputy City Attorneys for Defendant and Respondent, City of San Diego.

Allen Matkins Leck Gamble Mallory & Natsis, Jeffrey A. Chine and Heather S. Riley, for Real Parties in Interest and Respondents.

Bankers Hill 150 and Bankers Hill/Park West Community Association (collectively, the Association) appeal the judgment entered after the trial court denied their petition for writ of mandate challenging a decision by the City of San Diego (City) to approve a development application for the 6th & Olive Project (the Project), a 20-story mixed-use building with a total of 204 dwelling units in the Bankers Hill neighborhood near downtown San Diego.

Generally, the Association believes the Project is inconsistent with the neighborhood because it is too dense, too tall, and too close to the street. The Association contends the City abused its discretion in approving the Project because it was inconsistent with development standards and policies set forth in the City's General Plan and the Uptown Community Plan, which govern development in the Project's neighborhood. More specifically, it asserts the building's design improperly obstructs views, fails to complement neighboring Balboa Park, and towers over adjacent smaller-scale buildings. The Association asserts that the City could not reasonably approve the Project given its inconsistencies with the standards for development in the community.

In making its arguments, the Association sidesteps a critical factor in the City's decision-making process: the application of a state law known as the Density Bonus Law. (Gov. Code, § 65915 et seq.) The Density Bonus Law incentivizes the construction of affordable housing by allowing a developer to add additional housing units to a project beyond the zoned capacity and secure other "incentives" in exchange for a commitment from the developer to include deed-restricted affordable units in the project. When a developer meets the requirements of the Density Bonus Law, a local government is obligated to permit increased building density, grant

incentives, and waive any conflicting local development standards unless certain limited exceptions apply.

Here, the Project qualified for the benefits of the Density Bonus Law and the evidence does not support any of the limited exceptions to its application. Because the City was obligated to waive those standards if they conflicted with the Project's design, the Association's claim that the Project conflicts with certain development standards does not establish a basis for denying the Project.

Regardless, we conclude that the City did not abuse its discretion in finding the Project to be consistent with the City's land use plans. Several policies cited by the Association do not apply to the Project and the evidence in the record supports the City's conclusion that the Project does not conflict with the applicable policies. Accordingly, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Project

St. Paul's Cathedral (St. Paul's), located at the corner of Fifth Avenue and Nutmeg Street in the Bankers Hill neighborhood of San Diego, has served the community since the 1950's. With the cathedral itself located on the south end of the block, St. Paul's used the remainder of a city block for church offices, a surface parking lot, and a small apartment building. To the east, a large grassy area of Balboa Park is located across Sixth Avenue. While the neighboring parcels to the north (across Olive Street) and west (across Fifth Avenue) include older buildings ranging from one to three-stories, the parcel to the south (across Nutmeg Street) and other nearby parcels have seen recent development of large, mixed-use buildings.

As the surrounding neighborhood redeveloped at an increased density, St. Paul's determined it could ensure its long-term financial security by

3

selling part of its land to a developer. In November 2011, the San Diego City Council (City Council) approved a project to redevelop St. Paul's parcel to build a new mixed-use building, but that project was never built.

In late 2017, St. Paul's found a new development partner, Greystar GP II, LLC (Greystar), and submitted an application to the City for a revised project. The new 6th & Olive Project, at issue here, was proposed to include a total of 204 dwelling units. The Project would be 20 stories tall and reach a height of approximately 223 feet. The Project would also include new office space for St. Paul's and a large courtyard shared by St. Paul's and the new building. An underground parking garage for the building would include spaces to be used by St. Paul's.

As part of its permit application, Greystar offered to include 18 units with deed restrictions to make them affordable to very low-income households, defined as households with a combined annual gross income at or below 50 percent of the area median income. (See Health & Saf. Code, § 50105 [definition of "very low income households"].) Greystar represented that the inclusion of these affordable units would qualify the project for a density bonus and development incentives under the Density Bonus Law and what the City refers to as its own Affordable Housing Regulations. With this density bonus, Greystar sought to exceed the maximum zoned capacity of 147 units to add an additional 57 units. Additionally, Greystar relied on the Density Bonus Law to request development incentives to avoid a setback on one street, eliminate two on-site loading spaces for trucks, and reduce the number of private storage areas for residents.

B.    The City's Approval Process

As all parties agree, under the City's development review procedures, Greystar's application for permits required the discretionary approval of the

4

City's Planning Commission (Planning Commission), with a right to appeal the commission's decision to the City Council. To approve the permits, the Planning Commission was required to find that the proposed development would not "adversely impact the applicable land use plan."

As applied to the Project, the City's land use plan is found in three documents: (1) the City's General Plan, (2) the Uptown Community Plan, and (3) the Land Development Code. State law requires each city to adopt a general plan for its physical development. (See, e.g., *Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto* (2016) 1 Cal.App.5th 9, 17 (*Naraghi Lakes*).) The general plan guides future development in a city and contains the fundamental policy decisions guiding such development. (*Ibid.*) In the City, the General Plan provides a framework, but then incorporates more detailed community plans, like the Uptown Community Plan, as an "essential and integral component" of the General Plan. The Land Development Code, found in the Municipal Code, includes additional implementing regulations related to zoning and land use, most of which are not relevant to the issues on appeal. Compatibility with these plans is a central focus of the City's discretionary review process.

Before reaching the Planning Commission, the project was considered by Uptown Planners, the community planning group designated to review projects in the Uptown community to determine their consistency with the Uptown Community Plan.[1] Although styled as an approval of the Project, the group voted to recommend the City support a building with a different

---

[1] As explained by the City in its review documents, staff directed Greystar to present the Project to Uptown Planners because that group "is officially recognized by the City as a representative of the community, and an advisor to the City in actions that would affect the community."

design, including a maximum height of 170 feet, the inclusion of as much affordable housing as possible, and a modification of the proposed design to "activate public space at the base of the project with the community."

City staff prepared a report to the Planning Commission to aid in review of the project and recommended the Project be approved. The staff report concluded the project was consistent with the General Plan, the Uptown Community Plan, and the Land Development Code. The report noted that the Project "is located within the Community Plan's Mixed-Use Corridor, which promotes very-high residential densities along major commercial transit corridors." Staff explained how the Project's architectural design was consistent with the goals of the community plan by including a façade varied in depth and materials, several building entrances and "façade articulation using balconies and upper-story setbacks along Sixth Avenue to minimize view obstructions to Balboa Park and provide a transition in scale from St. Paul's Cathedral." Staff commended the Project for adding "visual variety and interest" by incorporating windows along the street level and balconies with glass railings. The report also noted that the Project included a large outdoor terrace in an upper floor.

Regarding the height of the Project, the report noted that under the "Community Plan Implementation Overlay Zone (CPIOZ)," the Project was subject to additional review because it exceeded 65 feet in height. Staff concluded that because the Project complied with all applicable policies, it was permitted to exceed the 65-foot height threshold.

Counsel for the Association submitted a letter to the Planning Commission opposing the project. The letter asserted that the Project "proposes to develop at greater intensity than currently allowed for height, setback, loading spaces, private storage area, driveway width, and exterior

6

refuse and recyclable material area. Each of these will create inconsistencies with the existing neighborhood." Counsel acknowledged the Project applicant was relying on the Density Bonus Law, but asked the commission to find a statutory exception applied because the project "will lead to several significant impacts to health, safety, and the environment." Counsel also argued that the City was violating the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[2]

At the Planning Commission hearing, members of the public spoke both in favor and opposed to the Project. A representative of Greystar, the Project applicant, spoke to note that the project relied on the incentives provided by the Density Bonus Law such that the opponents' request to decrease the height of the building was contradictory to the inclusion of the affordable units. Following a discussion, the Planning Commission unanimously approved the project.

Uptown Planners, the community planning group, appealed the Planning Commission's approval to the City Council. In its appeal, Uptown Planners asserted (1) the use of an EIR addendum was improper; (2) the Project's height would result in significant shading in Balboa Park; (3) the additional height would intrude into a flight path for airplanes flying to San Diego Airport; (4) the Project would "tower" over the adjacent neighborhood; (5) the lack of a setback on Olive Street would impair views; (6) the top floors would include luxury housing units and should be eliminated; and (7) the Project required a new EIR.

---

[2]    The Association has since abandoned its claims regarding CEQA compliance.

7

Before the City Council hearing on the appeal, the Association's counsel sent a letter repeating its prior challenges to the Project and asserting the City was violating CEQA. The Association also submitted a "petition opposing height of 6th & Olive Project" signed by members of the community suggesting that a shorter building height of 170 feet was "an acceptable compromise."

In a report to the City Council, staff noted that the inclusion of affordable units entitled the project to a density bonus and incentives allowing for a deviation from regulations, including the setback requirement. Staff also stated that the height increase "allows for the inclusion of 18 on-site affordable units that would be affordable to very low-income households." Staff concluded that "with the approved incentives and deviations, the project is in conformance with all applicable regulations and policies as set forth in the [Land Development Code] and [Uptown Community Plan]. The requested incentives and deviations are consistent with the intent of the State's Density Bonus Law, [and] the City's Affordable Housing Regulations."

At the City Council hearing, opponents challenged the height of the building and opined the inclusion of affordable units did not warrant the incentives given to eliminate the setback and increase the height of the Project. The senior pastor for St. Paul's spoke in favor of the project, stating that the provision of affordable housing for the increased height "is a worthwhile tradeoff." A representative of Greystar explained that maximizing the density "allows" for the affordable units. That same representative later informed the City Council that if the height of the building was reduced, "I'm quite certain that we wouldn't be able to provide any onsite affordable housing." Another St. Paul's representative also

8

explained that making the building shorter "would ruin the economics that allow for the onsite affordable housing."

The City Council voted unanimously to deny the appeal and approve the Project. In the approved resolution, the City Council found that the Project was "consistent with the goals and policies of the General Plan and [Uptown Community Plan]" and complied with the applicable regulations of the Land Development Code. The City Council also found the Project "would help implement the goals and policies" of the community plan's urban design element and development form policies. The resolution also noted the application of the City's Affordable Housing Regulations and the Density Bonus Law. The resolution concluded by denying the appeal, affirming the decision of the Planning Commission, and granting the necessary permits for the Project.

## C.    Trial Court Proceedings

The Association filed a petition for writ of mandate challenging the City Council's decision. The petition alleged that the Project (1) violated the City's General Plan and the Uptown Community Plan; (2) violated the Municipal Code; (3) violated state law, including the Density Bonus Law; and (4) that the City Council failed to adopt findings supported by substantial evidence in the record.

In its opening brief in the trial court, the Association did not discuss the Density Bonus Law and argued only that the Project violated the City's General Plan and Uptown Community Plan and that the City Council failed to adopt adequate findings. The brief focused on the Project's deviation from the setback requirements and its "height and massing."

In an opposition brief, the City asserted that the Association's failure to discuss the City's Affordable Housing Regulations and the Density Bonus

9

Law, which specifically authorized the setback deviation and increased density, "represents a fatal flaw in their brief." The City also argued that the project was entirely consistent with the applicable plans and that the City Council made adequate findings.

At the hearing on the petition, the trial court's only question to the Association's counsel was regarding the Density Bonus Law and the impact of the incentives granted under that program on the Association's claims. In response, counsel argued that even under the Density Bonus Law, "[t]he City still had to conduct an analysis of its policies, all those policies regarding all aspects of the project before approving it."

After the hearing, the trial court denied the Association's petition. The court found the Project was consistent with the Uptown Community Plan, largely because many of the policies cited by the Association were inapplicable to the project. The court also found that the project's use of incentives was appropriate and noted that the deviation from the required setback "was specifically authorized by the City's Affordable Housing Regulations and State Density Bonus Law." The court further noted that the Association "failed to apprise the Court of this fact" and that the failure to address the issue "is fatal to Petitioners."

The trial court also found the project was consistent with the General Plan and that the City made the required findings to approve the Project. The court therefore denied the writ petition and directed the City to prepare a judgment. The Association filed a timely appeal from the subsequent judgment.

## II. DISCUSSION

### A.   Governing Principles

In its petition for writ of mandate, the Association contends that the City erred in approving the Project.  Our review is limited to determining whether the City prejudicially abused its discretion in approving the Project by not proceeding in a manner required by law, by reaching a decision not supported by its findings, or by making findings not supported by the evidence.  (Code Civ. Proc., § 1094.5, subd. (b); *Save Our Heritage Organisation v. City of San Diego* (2015) 237 Cal.App.4th 163, 172-173 (*Save Our Heritage*).)  In conducting our review, we are not constrained by the trial court's decision, but instead independently review the City's actions.  (*Naraghi Lakes*, *supra*, 1 Cal.App.5th at p. 10.)

The Association focuses on its claim that the Project was not consistent with the City's General Plan and the Uptown Community Plan and that the City's findings to the contrary were inadequate and not supported by substantial evidence.  However, before reaching the Association's claims regarding the City's purported abuse of discretion based on making findings not supported by the evidence, we must consider the scope of the City's discretion under applicable state law.

### B.   The City Proceeded in the Manner Required by the Density Bonus Law

Throughout its challenge to this Project, the Association has sidestepped the implications of the Density Bonus Law and the City's related Affordable Housing Regulations.  The Association does not directly address the issue in its opening brief and then asserts in its reply brief, in a single paragraph with no citation to any authority, that the "density bonus is not a free pass."  (Capitalization omitted.)  As we explain, while not a "free pass," the Density Bonus Law shapes the City's discretion in reviewing the Project

11

and undermines the Association's contention that the City was obligated to deny the Project.

### 1. Legal Background

Government Code section 65915, commonly referred to as the "Density Bonus Law," was first enacted in 1979 with the aim to address the shortage of affordable housing in California. (*Latinos Unidos Del Valle De Napa Y Solano v. County of Napa* (2013) 217 Cal.App.4th 1160, 1164 (*Latinos Unidos*).) " 'Although application of the statute can be complicated, its aim is fairly simple: When a developer agrees to construct a certain percentage of the units in a housing development for low- or very-low-income households, or to construct a senior citizen housing development, the city or county must grant the developer one or more itemized concessions and a "density bonus," which allows the developer to increase the density of the development by a certain percentage above the maximum allowable limit under local zoning law. [Citation.] In other words, the Density Bonus Law "reward[s] a developer who agrees to build a certain percentage of low-income housing with the opportunity to build more residences than would otherwise be permitted by the applicable local regulations." ' " (*Ibid.*; see also *Schreiber v. City of Los Angeles* (2021) 69 Cal.App.5th 549, 554-555 (*Schreiber*).)

When a developer agrees to include a specified percentage of affordable housing in a project, the Density Bonus Law grants that developer (1) a "density bonus;" (2) "incentives and concessions;" (3) "waivers or reductions" of "development standards;" and (4) prescribed "parking ratios." (§ 65915,

12

subd. (b)(1).) All of these provisions, other than parking ratios, are relevant to the Project.[3]

First, the *density bonus* allows for additional units, above the maximum allowed by zoning, to be added to a project based on the amount of affordable housing included in the project. Subdivision (f) of section 65915 includes tables that prescribe a density bonus percentage, which progressively increases as a developer agrees to add a greater percentage of affordable units in the project. The higher the percentage of affordable units, the higher the percentage of the density bonus allowing a developer to exceed the zoned density. (*Ibid.*)

Second, the *incentives and concessions* are intended to assist in lowering the cost to build a project that includes affordable housing by allowing the developer to avoid development standards.[4] (§ 65915, subd. (d)(1).) An "incentive or concession" is defined as a "reduction in site development standards or a modification of zoning code requirements or architectural design requirements that exceed the minimum building standards . . . that results in identifiable and actual cost reductions." (*Id.* at subd. (k)(1).) The law states that a "site development standard" includes setbacks, height limitations, and other requirements imposed by "any ordinance, general plan element, specific plan, charter, or other local condition, law, policy, resolution, or regulation." (*Id.* at subds. (k)(1), (*o*)(1).) The applicant is not required to prove the requested incentives will lead to

---

3    The City's staff report noted the project was eligible for a reduced parking ratio, but Greystar voluntarily elected to exceed the number of required parking spaces.

4    " 'Concession' and 'incentive' are synonymous in the statute." (*Schreiber*, *supra*, 69 Cal.App.5th at p. 555.)

cost reductions; the incentive is presumed to result in cost reductions and the city bears the burden to demonstrate otherwise if it intends to deny the incentive.  (*Schreiber*, *supra*, 69 Cal.App.5th at p. 555.)

Third, a city must offer a *waiver or reduction* of development standards that would have the effect of physically precluding the construction of a development at the density, or with the requested incentives, permitted by the Density Bonus Law.  (§ 65915, subd. (e)(1).)  For example, if a city ordinance imposes a building height limitation, a city must waive that limitation for a development that is eligible for a density bonus if imposing the height limit would physically preclude construction of the proposed building with the requested incentives and at the density allowed by the Density Bonus Law.  There are no financial criteria for granting a waiver. (*Schreiber*, *supra*, 69 Cal.App.5th at p. 556.)

The Density Bonus Law includes very limited exceptions to its requirements and places the burden on a city to establish an exception applies.  A concession or incentive may be refused if the city can establish it would not result in identifiable and actual cost reductions to provide for affordable housing costs.  (§ 65915, subd. (d)(1)(A).)  The only other exceptions to the requirement to grant incentives and concessions or waivers and reductions of standards require the city to find, based on substantial evidence, that doing so (1) would have "a specific, adverse impact . . . upon public health and safety," (2) would have an adverse impact on any historic resource, or (3) would be contrary to state or federal law.[5]  (*Id.* at subds. (d)(1)(B)-(C), (e)(1).)

_____

[5]     At the time of Project approval, the Density Bonus Law also included an exception that applied if a project would have a specific, adverse impact upon the "physical environment." A recent amendment removed that exception, which is not directly relevant to the issues considered on appeal.

14

The Density Bonus Law requires cities to adopt an ordinance to implement the state law and preempts any inconsistent local provisions. (§ 65915, subd. (a); *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 830 (*Friends of Lagoon Valley*); *Latinos Unidos, supra,* 217 Cal.App.4th at p. 1169; see also *Schreiber, supra,* 69 Cal.App.5th at p. 558.) Here, the City's own implementing ordinance, which it refers to as its "Affordable Housing Regulations," is found in section 143.0740 of the Land Development Code. The Affordable Housing Regulations largely mirror the requirements of the Density Bonus Law, but also provide some additional incentives not directly relevant to the issues raised in this appeal.[6]

## 2. Additional Factual Background

In its initial application, Greystar informed the City that it intended to include affordable units in the Project to secure a density bonus and incentives under the Density Bonus Law and the City's Affordable Housing Regulations.

An analyst at the San Diego Housing Commission reviewed the application and noted that Greystar "requests a density bonus pursuant to California Government Code Sections 65915-65918 and [the] San Diego Municipal Code." The analyst concluded that by proposing to designate 12 percent of the Project's units as affordable to very low-income households, the developer was entitled to "a 38.75% density bonus and 3 development incentives."

---

[6] A city's local ordinance may provide for a density bonus or incentives that exceed the Density Bonus Law. (See, e.g., *Friends of Lagoon Valley, supra,* 154 Cal.App.4th at pp. 824-830.)

15

Thus, as calculated by staff, by including 12 percent of its units as units affordable to very low-income residents, the Project was entitled to a 38.75 percent density bonus under the City's regulations as they existed at the time the Project was approved.[7] As applied, the result is that while the applicable zoning allowed a building on the Project site to include 147 dwelling units, the density bonus of 38.75 percent (or 57 units) allowed the Project to be built at an increased density of 204 residential units.[8]

Greystar also requested incentives, including one to avoid the setback requirement of 15 feet for a portion of the building along Olive Street. Greystar explained in its application that the building would be too narrow if it were required to comply with the setback and stated that "if the 15 [foot] setback were implemented, the building would be forced to use a single loaded corridor, making the project financially infeasible." In a "Deviations/Incentives Request Form," submitted to the City, Greystar again requested an incentive to avoid the setback on the basis that abiding by the setback would make the building shape "inefficient and create an awkward

---

[7] The Density Bonus Law has been frequently amended, but the recent amendments do not materially affect the issues in this case. The specific density bonus that would apply to the Project under the current state law matches the City's Affordable Housing Regulations in effect at the time the Project was approved. (§ 65915, subd. (f)(2).) As noted in footnote 6, a city's density bonus may exceed the density bonus permitted by state law.

[8] Precisely, the 38.75 percent density bonus over the permitted 147 units allowed for an additional 56.9625 units, but the Density Bonus Law requires cities to round up to the next whole number. (§ 65915, subd. (f)(5).) The Association challenged the calculation of the density bonus during the approval process and in the trial court, but does not raise that issue in its opening brief. Accordingly, the issue is forfeited. (See, e.g., *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1542.)

16

circulation and unit layouts." Greystar also sought other incentives not relevant to the issues on appeal.

In a report, City staff concluded that the Project "qualifies as an affordable housing density bonus residential development and . . . is entitled to certain benefits, including density bonus, reduced parking standards, and development incentives." The same report notes that "[s]taff determined the requested incentives are consistent with the intent of the State's Density Bonus Law." In its resolution denying the appeal and affirming the Planning Commission's approval, the City Council expressly found that the "development incentives request is consistent with the intent of the State's Density Bonus Law and there is no substantial evidence pursuant to the [Municipal Code] or State law to deny applicant's request for incentives." The City Council also concluded the Project was consistent with all applicable development standards, suggesting no waivers or reductions were necessary under the Density Bonus Law.

### 3. Analysis

A public agency, like the City, abuses its discretion by not proceeding in a manner required by law when reaching a decision. (Code Civ. Proc., § 1094.5, subd. (b).) Our analysis, therefore, begins with the City's discretion under the law, specifically the Density Bonus Law, to either approve or deny the Project. Seeking to overturn the City's approval, the Association contends the City should have denied the Project due to its alleged violation of development standards regarding setbacks and building size. However, as we shall explain, under the Density Bonus Law, the City could deny the Project due to those alleged violations only if it made specific findings that certain exceptions applied. The Association does not contend the evidence establishes that the City could have made any of those specific findings and,

17

therefore, we conclude the Project was entitled to the benefits of the Density Bonus Law and the City properly exercised its discretion to approve the Project.

In challenging the City's approval, the Association focuses primarily on the Project's deviation from setback requirements along Olive Street. In arguing the Project is inconsistent with the City's land use plans, the Association contends that because of the deviation from the setback requirement, the Project did not "maintain and enhance views of Balboa Park," included inadequate "façade articulation," improperly transitioned from the neighboring shorter buildings, and did not respect the scale of neighboring buildings. Due to the alleged inconsistencies caused by the lack of a setback, the Association contends the City abused its discretion in approving the Project.

As discussed above, Greystar expressly requested an incentive under the Density Bonus Law to avoid the setback requirement. Pursuant to subdivision (d) of section 65915, the City could deny the requested incentive *only* if it found the incentive (1) does not result in identifiable and actual cost reductions, (2) would have a specific adverse impact upon public health and safety or the physical environment or upon a historical resource, or (3) would be contrary to state or federal law. (*Id.* at subd. (d)(1)(A)-(C).) The City Council expressly found that there was no substantial evidence to support the denial of the requested incentive.[9] The Association makes no showing that the City Council erred in making this finding. Thus, the City properly

9    The City was not required to substantiate this "negative finding" with evidence. (*Schreiber*, *supra*, 69 Cal.App.5th at p. 559.)

18

granted the incentive and the Association's argument that the City abused its discretion in doing so fails.

Many of the Association's other arguments regarding inconsistencies with development standards focus on the effect caused by the Project's reduced setback on views, transitions, and architectural design standards. These arguments imply that even if the Project was granted a reduced setback, the City could deny the Project simply by relying on inconsistencies with other development standards. Similarly, the Association focuses on the height and "massing" of the Project and argues that given the Project's inconsistency with development standards, "the City is precluded from permitting development above 65 feet" on the parcel at issue. In other words, the Association asserts that the City should have required the Project to meet all development standards by being shorter and smaller.

However, as discussed above, Greystar was entitled under the Density Bonus Law to a waiver of any development standard that would have the effect of physically precluding the construction of the Project at the permitted density and with the requested incentive unless the City could make the specified findings to warrant an exception from the Density Bonus Law. (§ 65915, subd. (e)(1).) In other words, once Greystar established its eligibility for the density bonus and requested the setback reduction as an incentive, it was entitled to a waiver of any development standards that would preclude construction of the Project unless the City made certain findings. The City concluded it could not make those findings and the Association does not argue the City erred in this regard.

Indeed, while the Density Bonus Law does not require a developer to establish that the requested incentives and waivers are necessary to ensure financial feasibility, the record demonstrates that including the affordable

19

units in the Project was possible only if the building was designed as proposed. In other words, imposing the setback requirement, decreasing the height, or redistributing the units would preclude construction of the Project. This reality was confirmed by representatives of Greystar, who told the City Council that reducing the height of the building would result in the elimination of "onsite affordable housing" and "would ruin the economics that allow for the onsite affordable housing." If the City had denied the requested incentives or failed to waive any inconsistent design standards, it would have physically precluded construction of the Project, including the affordable units, and defeated the Density Bonus Law's goal of increasing affordable housing.

The Association contends on appeal that the Project's design was not dictated by the density bonus and related incentives, but rather by the inclusion of a large courtyard to be used by the church and the community. The Association relies on the suggestion by a city councilmember that without the courtyard the Project could have been "built more horizontally" (i.e., shorter) to imply that if the courtyard were eliminated, the Project could be redesigned to be shorter and less bulky. Arguably, this would allow the Project to comply with some, if not all, of the design standards that the Association asserts are inconsistent with the Project design.

This precise argument was raised and rejected in *Wollmer v. City of Berkeley* (2011) 193 Cal.App.4th 1329 (*Wollmer*), which also involved a density bonus project designed with a courtyard. The First District considered the history of the Density Bonus Law's language and concluded that when a developer proposes a project that qualifies for a density bonus, the law provides a developer with broad discretion to design projects with additional amenities even if doing so would conflict with local development

20

standards.  The court held that nothing in the Density Bonus Law "requires the applicant to strip the project of amenities, such as an interior courtyard, that would require a waiver of development standards.  Standards may be waived that physically preclude construction of a housing development meeting the requirements for a density bonus, period.  (§ 65915, subd. (e)(1).)  The statute does not say that what must be precluded is a project with no amenities, or that amenities may not be the reason a waiver is needed." (*Id.* at pp. 1346-1347.)  Similarly, amendments to the law in 2008 had the effect of "delet[ing] the requirement that an applicant for a waiver of development standards must show that the waiver was necessary to render the project economically feasible." (*Id.* at p. 1346.)

The *Wollmer* court explained that a city would be in violation of the Density Bonus Law if it failed to waive development standards that would physically preclude construction of a project.  (*Wollmer, supra,* 193 Cal.App.4th at p. 1347.)  "If the project were not built, it goes without saying that housing units for lower-income households would not be built and the purpose of the [D]ensity [B]onus [L]aw to encourage such development would not be achieved." (*Ibid.*)  Thus, unless one of the statutory exceptions applies, so long as a proposed housing development project meets the criteria of the Density Bonus Law by including the necessary affordable units, a city may not apply any development standard that would physically preclude construction of that project as designed, even if the building includes "amenities" beyond the bare minimum of building components.

As applied here, the interpretation of section 65915 set forth by the court in *Wollmer* leads us to conclude that the City (or, by extension, the Association via this lawsuit) could not demand Greystar remove the courtyard or redesign its building to satisfy the Association's subjective

21

concerns. Under the Density Bonus Law, a City may only impose such development standards if *not* doing so "would have a specific, adverse impact . . . upon health or safety, and for which there is no feasible method to satisfactorily mitigate or avoid the specific adverse impact" or "would have an adverse impact on any real property that is listed in the California Register of Historical Resources, or to grant any waiver or reduction that would be contrary to state or federal law." (§ 65915, subd. (e)(1).)

As discussed above, the Association makes no showing that any of these exceptions apply here. Thus, even if we assume the Project as designed is inconsistent with some of the City's design standards, the Density Bonus Law would preclude the City from applying those standards to deny this project. Accordingly, regardless of the merit of the Association's contentions on appeal, it fails to establish a basis for relief because the City's discretion to deny the Project application was constrained by state law. On this basis, the Association's arguments fail.

## C. The City's Finding the Project Is Consistent With its Land Use Plans Is Supported by the Evidence.

Aside from the constraints imposed by the Density Bonus Law, the Association fails to establish that the Project conflicts with any of the applicable design standards that it relies upon to establish the City abused its discretion in approving the Project.

The parties agree, as this court recently recognized, that the City's land use decisions, including approval of the Project, must be consistent with the applicable policies expressed in the City's General Plan. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 498.) "General plans ordinarily do not state specific mandates or prohibitions. Rather, they state 'policies,' and set forth 'goals.'" (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342,

22

378 (*Napa Citizens*).) A project is consistent with a general plan if " 'it will further the objectives and policies of the general plan and not obstruct their attainment.' " (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994.) To be consistent with a general plan, a project " 'must be "compatible with" the objectives, policies, general land uses, and programs specified in the general plan.' " (*Napa Citizens,* at p. 378.) "The question is not whether there is a direct conflict between some mandatory provision of a general plan and some aspect of a project, but whether the project is compatible with, and does not frustrate, the general plan's goals and policies." (*Ibid.*) The requirement that a project be consistent with a general plan does not require the project to rigidly conform to the general plan. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678 (*San Franciscans Upholding*).) "State law does not require perfect conformity between a proposed project and the applicable general plan." (*Friends of Lagoon Valley*, *supra*, 154 Cal.App.4th at p. 817.) " '[G]eneral and specific plans attempt to balance a range of competing interests. It follows that it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . . It is enough that the proposed project will be *compatible with* the objectives, policies, general land uses and programs specified in the applicable plan.' " (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 411-412 (*Holden*); see also *Save Our Heritage*, *supra*, 237 Cal.App.4th at p. 186.)

In its respondents' brief, the City asserted that we must give significant deference to an agency's finding that a project is consistent with its own general plan it adopted. (See *Holden, supra,* 43 Cal.App.5th at p. 412.) However, in a recent decision, the First District held that when a court

23

reviews an agency's decision on a *housing* development project, a recent change to state law requires a more stringent review. (*California Renters Legal Advocacy and Education Fund v. City of San Mateo* (2021) 68 Cal.App.5th 820 (*California Renters*).) The relevant statute, known as the Housing Accountability Act (HAA) (Gov. Code, § 65589.5) "cabins the discretion of a local agency to reject proposals for new housing." (*California Renters*, at p. 844.) Thus, the First District concluded that it would be inappropriate for a court to defer to a city's interpretation and, instead, the court "must engage in ' "more rigorous independent review . . . in order to prevent the City from circumventing what was intended to be a strict limitation on its authority." ' " (*Ibid.*)

The discussion in *California Renters* was framed by the circumstances of that case, in which the city denied a housing development project. Here, the City approved the Project, which lessens the need for a more stringent, independent review. Regardless, the level of deference to be afforded to the City's decision does not alter our ultimate conclusion that the City did not abuse its discretion in approving the Project.[10]

An agency abuses its discretion if it makes findings not supported by the evidence. (Code Civ. Proc., § 1094.5, subd. (b).) Although the parties contend we apply the typical substantial evidence standard of review, the HAA imposes a slightly different standard when an agency is considering approval of a housing development project. "[I]nstead of asking, as is common in administrative mandamus actions, 'whether the City's findings are supported by substantial evidence' [citation], we inquire whether there is

---

[10] In supplemental briefing requested by the court, the parties recognize the HAA is applicable to the Project and do not challenge the application of that law in *California Renters.*

24

'substantial evidence that would allow a reasonable person to conclude that the housing development project' complies with pertinent standards." (*California Renters*, *supra*, 68 Cal.App.5th at p. 837.) "The effect of subdivision (f)(4) is simply to hold local governments to a standard of objectivity in their decisionmaking, such that if a *reasonable* person could find a housing development in compliance, it will be so deemed. If a municipality wishes to enforce limitations on housing developments, it must promulgate standards that are not so malleable that reasonable minds could differ on whether they are met. In short, the HAA does not wrest control from local governments so much as require them to proceed by way of clear rules adopted in advance, rather than by ad hoc decisions to accept or reject proposed housing." (*Id.* at pp. 850-851; Gov. Code, § 65589.5, subd. (f)(4).)

Additionally, the recent decision in *California Renters* clarified that under the HAA, an agency may deny approval of a housing development project on the basis that it is inconsistent with development standards *only* if those standards are "objective." (*California Renters*, *supra*, 68 Cal.App.5th at pp. 839-840.) A standard is subjective, rather than objective, if it "cannot be applied without personal interpretation or subjective judgment." (*Id.* at p. 840.)

Here, the Association relies on several development standards that appear entirely subjective. For example, the Association relies on standards suggesting a new building should "sensitively and adequately transition to adjacent lower height buildings," "complement" the natural environment, and include design features that "enhance" views. As the record demonstrates, personal opinions differ on how well the Project is designed when considered under these standards. In its supplemental letter brief, the Association acknowledges that under the HAA, the City could rely only on "objective"

25

standards to deny the Project, but does not discuss whether the standards at issue in this case are objective. In its letter brief and at oral argument, the City concedes that its planning policies at issue in this case "are subjective in nature, and thus, cannot serve as a basis for disapproval under the HAA."

However, we need not decide which standards are objective because we see no error by the City in finding the Project to be consistent with each applicable standard. We consider each policy advanced by the Association in turn to determine (1) whether it is applicable; and (2) if applicable, whether the evidence supports the City's conclusion the Project is consistent with the policy.

### 1. Policy UD-1.3

The Association begins by relying on Policy UD-1.3 of the Uptown Community Plan, which sets forth the goal that buildings be designed to "maintain view corridors along public rights-of-way and to enhance pedestrian and auto views to Balboa Park, Mission Bay, and San Diego Bay." However, the Uptown Community Plan identifies the community's "view corridors" in Figure 4-3 and does *not* classify the view down Olive Street to be one of those corridors. The nearest identified "view corridors" are found along Laurel Street and at Quince Street. The Project has no effect on those view corridors. Policy UD-1.3 also requires projects to "enhance" views, which we consider in our discussion of Policies UD-4.1, UD-4.5, and UD-4.6.

### 2. Policies UD-4.79 and UD-4.80

Policies UD-4.79 and UD-4.80 note that the Uptown community's "residential neighborhoods" are composed of small-scale buildings and require new buildings in these neighborhoods to be "[d]esign[ed] to conform to the predominant scale of the neighborhood" and include designs "to sensitively and adequately transition to adjacent lower height buildings."

26

However, the Project is *not* in a "residential neighborhood." The Uptown Community Plan recognizes in Figures 4-1 and 4-4 that the Project is instead located in a "mixed use" zone. The Association admits this fact on appeal. As the City also notes, a large portion of the Project site and many of the adjacent parcels are zoned as "Community Commercial," *not* residential. The Community Plan makes clear that different policies, UD-4.71 through UD-4.74, apply in such areas given the "eclectic variety of buildings in [Uptown's] commercial and mixed-use areas" and the Association offers no argument that the Project does not comply with those policies. Thus, the Community Plan's policies applicable to "residential neighborhoods" do not apply to the Project.

### 3. UD-4.90 and UD-4.91

Policies UD-4.90 and UD-4.91 discuss "development transitions," which seek to "minimize the visual intrusiveness" of large buildings placed next to small-scale buildings. To do so, the policies suggest imposing a "transition plane" to limit the height of new buildings. The Association contends these policies apply to every parcel in the community to limit the size of new, large buildings when they are constructed next to existing, smaller buildings.

This contention is not supported by the plain language of the Uptown Community Plan. Instead, the plan requires these transitions only for parcels zoned for large buildings that border areas with different zoning allowing only small-scale buildings. The plan discusses the transitions between "higher density areas to lower density areas" and clarifies the importance of transitions between neighborhoods "where maximum building heights differ . . . *as a result of zoning*." (Italics added.) The plan recognizes the need for transitions along a singular "transition line" between areas zoned for different densities, with the massing of higher scale buildings

27

placed along the portion of the site farthest away from that line. Similarly, in Policy LU-2.10, the Community Plan reflects the need to "[e]nsure adequate transition between commercial/mixed-use and residential uses." These policies reflect that the anticipated transitions occur between areas with different zoning, not between an existing building and a newly-proposed building on neighboring parcels sharing the same or similar zoning. The Land Development Code, in section 131.0543(c)(1), also recognizes the need for transitions only between areas with different zoning by requiring projects to include setbacks for larger commercial and mixed-use buildings *only* when they abut parcels with low-density residential zoning.[11]

Although not dispositive, the evidence also establishes that the Association's interpretation of these policies conflicts with other recent development. The Association focuses on the Project's transition to the shorter "Abbey" building across Olive Street. However, the record includes several photographs and diagrams revealing that immediately to the north of the Abbey, a "14 story high rise known as the Park Bankers Hill" was recently constructed without the transition that the Association suggests applies for parcels sharing a property line. The record includes a diagram demonstrating that many of the other recent high-rise buildings on the surrounding blocks are adjacent to small-scale buildings and do not include the transitions that the Association seeks to impose on the Project. This suggests that the City's practice is to not apply Policies UD-4.90 and UD-4.91

---

[11] We grant the City's unopposed request for judicial notice of the relevant Municipal Code sections. However, we deny the request for judicial notice of an internal memorandum discussing building transitions that was not included in the administrative record and for which the trial court denied a request for judicial notice.

in the vicinity of the Project.  We see no basis for applying them to the Project.

### 4.    General Plan Policy UD-A.3

Turning to the City's General Plan, Policy UD-A.3 sets forth the goal to "[d]esign development adjacent to natural features in a sensitive manner to highlight and complement the natural environment in areas designated for development."  The Association contends that the Project does not "complement" neighboring Balboa Park, which it contends is part of the City's "natural environment."

In response, the City contends that the General Plan distinguishes between "natural features" and "park lands" such that all parks, including Balboa Park, are not "natural features."  In reply, the Association highlights a discussion in the General Plan that lists parks as part of the "natural environment."

Our interpretation of the General Plan suggests the correct answer lies between the positions of the two parties:  while a particular park may be considered part of the "natural environment" because it includes "natural features" based on its unique characteristics, not all parks fall within that category.  The General Plan and the Uptown Community Plan suggest that some parks within the City have been left in a natural state and may include "natural features," but the General Plan also notes that Balboa Park "*modified* the natural environment," implying it is no longer a purely natural environment.  (Italics added.)  In a similar case, this court recognized that Balboa Park is a "*developed urban* park" and constituted an "urban use" of land.  (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 254, 271, italics added.)  As

29

such, the area of Balboa Park adjacent to the Project is not a "natural feature" warranting minimal development on adjoining parcels.

Indeed, even if Policy UD-A.3 of the General Plan applies, the record reflects that the Project "complements" Balboa Park in the manner envisioned by the Community Plan, which designates the parcels bordering Balboa Park as having the highest zoned density of the entire community. As one planning commissioner noted, the goal of the Community Plan was to design Sixth Avenue along Balboa Park to replicate "Central Park West" in Manhattan by having "a line of buildings . . . [demarcating] the boundary with the . . . regional park." Rather than violating these policies, the Project fits within the City's plan for the neighborhood at its interface with Balboa Park.

Additionally, in Policy UD-3.44 of the Community Plan, buildings along Sixth Avenue are instructed to "[e]nhance the adjacency of Balboa Park . . . through similar themed landscaping [and] increased setbacks." Similarly, in Policy UD-3.45, the plan specifies that new development should "provide a 10-foot minimum setback from property line for lots fronting the west side of Sixth Avenue (south of Upas Street) in order to establish a 30-foot total building setback from building face to curb. The resulting yard shall be landscaped and palm tree species shall be planted adjacent to sidewalks to form a parallel row of trees with Balboa Park."

The Project exceeds these requirements by providing a 15-foot setback along Sixth Avenue. The Project includes numerous trees, including a row of palm trees, and other landscaping along Sixth Avenue. This design complements Balboa Park in the manner envisioned by the Community Plan.

30

Although the Association may prefer a different design, it fails to establish any error by the City in approving the Project.[12]

## 5. Policies UD-4.1, UD-4.5, and UD-4.6

In the Community Plan, Policies UD-4.5 and UD-4.6 seek to have new development include "façade articulation through the use of balconies, terraces and/or upper-story setbacks on high-rise buildings" to minimize view obstructions and enhance views of Balboa Park. This language mirrors a part of Policy UD-1.3, which also requires projects to "enhance views" of Balboa Park. Similarly, Policy UD-4.1 seeks to improve the pedestrian environment by requiring varied and articulated street façades "through the use of such features as notched setbacks, projecting bays, balconies, recessed storefront entrances, sidewalk cafes, window bays, and pedestrian passages to create visual interest."

The administrative record includes evidence supporting the conclusion that the Project satisfies these policies. The Project includes balconies, a terrace on an upper-story setback, and a roof deck. On the street level, the Project includes a large courtyard and pedestrian passage, recessed entrances, and alternating stone and glass to provide a varied articulation on the façade. The City Council relied on these features to find the Project to be consistent with the Community Plan's Urban Design standards.

The Association asserts that even if the Project includes these features, they do not serve to "minimize view obstructions" and "enhance" views of Balboa Park. As the City Council recognized, the balconies are enclosed with

---

[12] In its appeal to the City Council, the Association focused on the shadowing of areas of Balboa Park by the Project as a basis for finding the Project to be incompatible with the park. It does not raise this argument on appeal and, accordingly, has forfeited any claim premised on shadowing.

31

glass railings to "add visual variety and interest."  Although the Association expresses different aesthetic opinions than the City Council, it fails to demonstrate that the City Council acted in an inherently unreasonable manner by finding the Project's design to be compatible with the Community Plan.

Moreover, the Association's opening brief focuses on *private* views of Balboa Park, not *public* views.  The Association asserts that "[t]he three buildings west of the Project site" will have their views impacted by the Project and complains that the Project "would block views from the two and three story buildings long [*sic*] Fifth Avenue."  This focus on views from private buildings is misplaced.  The Community Plan explains that "[w]hile views are common from vantage points under private ownership, . . . public views refer to those that are accessible from public vantage points such as public rights-of-way, parks, and landmarks."  Thus, the plan focuses in Policy UD-1.4 on ensuring that *public views* are not obstructed.  The Association fails to establish that the minimal balconies with translucent glass railings will unreasonably obstruct public views.

### 6. Community Plan Implementation Overlay Zone

Finally, the Association contends the Project is inconsistent with the "Community Plan Implementation Overlay Zone," or "CPIOZ."  The CPIOZ is referenced in the Uptown Community Plan, but also found in the City's Land Development Code.  Under the CPIOZ, the City may approve permits for buildings that exceed a height of 65 feet in the area where the Project is proposed only if the buildings "comply with the applicable regulations of the Municipal Code and are consistent with the applicable policies in the General Plan and Uptown Community Plan."

The Association contends the City could not approve the Project, which exceeds 65 feet in height, under the CPIOZ because of the other violations of the General Plan and Community Plan.  However, as we have discussed, we conclude the City Council did not abuse its discretion in finding the Project did not violate the applicable policies.

At most, the Project is inconsistent with the specific setback requirements along Olive Street.  However, the Association cannot rely on that deviation from the setback or the building's height as a basis for denial of the Project under the CPIOZ because, as we discussed, Greystar specifically requested an incentive under the Density Bonus Law and the City's Affordable Housing Regulations to avoid that setback and the Project's height was largely the result of its density bonus.  Thus, the height limit imposed by the City's CPIOZ ordinance must be waived if imposing that height limit would physically preclude construction of the project as designed unless the City could make a written finding, supported by substantial evidence, that the Project meets one of the statutory exceptions.  (§ 65915, subd. (e)(1).)  To the extent the CPIOZ height limit ordinance requires the City to deny a project entitled to a density bonus, incentive, or waiver of a development standard under the Density Bonus Law, it is preempted.  (*Latinos Unidos*, *supra*, 217 Cal.App.4th at p. 1169.)

In conclusion, the Association fails to establish the City abused its discretion by approving the Project because the City Council made adequate findings that the evidence in the record demonstrates that the Project is consistent with the applicable policies found in the General Plan, Uptown Community Plan, and Land Development Code.  Moreover, even if the Project is inconsistent with the standards set forth in those plans, the City was nevertheless compelled to approve the Project under the Density Bonus Law

33

based on the record before us.  Accordingly, the Association fails to establish any basis for relief.

## III.  DISPOSITION

The judgment is affirmed.  The City is entitled to its costs on appeal.


HALLER, Acting P. J.


WE CONCUR:


O'ROURKE, J.


GUERRERO, J.

Filed 2/2/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BANKERS HILL 150 et al., | D077963 |
| Plaintiffs and Appellants, | |
| v. | |
| CITY OF SAN DIEGO, | (Super. Ct. No. 37-2019-00020725-CU-WM-CTL) |
| Defendant and Respondent; | |
| GREYSTAR GP II, LLC, et al., | |
| Real Parties in Interest and Respondents. | |

THE COURT:

The opinion in this case filed January 7, 2022, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to rule 8.1120(a) for publication are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

HALLER, Acting P. J.

Copies to: All parties